HOSEA E. HOLT *vs.* EDGAR O. SILVER & others.

Suffolk.   December 9, 10, 1896. — November 23, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Jurisdiction — Defence — Damages — Equity Practice — Construction of
Contract.*

A plea and demurrer to the jurisdiction of this court over a suit in equity for breach
of contract, and to compel an account and a performance of the contract in other
respects, on the grounds that a suit between the same parties reversed and in-
volving the same subject matter is pending in a United States court, and that
the present suit is based upon the copyright laws of the United States, and is
exclusively within the jurisdiction of the United States courts, are rightly over-
ruled; and the fact that the contract was terminated when the bill was brought
makes no difference.

One party to a contract, who, by his own act, has put it out of the power of the
other party to comply literally with a provision of the contract as to the giving
of notice to terminate it, and another holding by assignment from the former,
are not entitled, in a suit in equity for breach of the contract, to rely on such
non-compliance.

Expenditures by one party to a contract, caused in greater part by apprehension
of injury based upon mere rumors, are not recoverable as damages in a suit for
breach of the contract.

The findings of a master, to whom a suit in equity has been referred, on matters
of fact, will not be reversed by this court, unless they clearly appear to be
erroneous.

The ruling of a master, and a similar ruling of a single justice at the hearing upon
exceptions to the master's report, will not be disturbed, on appeal, if all the evi-
dence on the point ruled upon is not before this court.

A. and B. executed a contract, which recited that, as A. was joint author with C.
of certain publications known as a music course, and coequal owner of the copy-
rights and electrotype plates of these publications, and as he was also then the
sole publisher of the same, he agreed that B. should have the exclusive right to
print and publish the same during three years from the date thereof, with the
use of all capital invested, appliances, and the like, theretofore used by him in
such business; that B. agreed to print and publish the same, to pay all expenses
of such printing and publishing, and to pay A. "a sum of money equal to not
less than five or more than fifteen per cent, as may be agreed upon, on the net
proceeds of said publications, it being understood that such net proceeds are
the receipts from all sales after deducting fifteen per cent therefrom as the sum
due to said A. and said C. as joint authors and coequal owners of the copy-
rights and electrotype plates, etc., as well as the cost of manufacture, and that
he will contribute the sum of two thousand dollars as further capital to be se-
cured by said A. and returned to said B. at the termination of this agreement";
and that A. and B. agreed "that to terminate this agreement at the end of three
years from the date hereof a notice in writing must be given" in a manner

specified. Four years later B. purchased the interest of C., and subsequently A. gave B. the notice provided therein for the termination of the contract. *Held*, in a suit in equity by A. against B., that B. was entitled to recover the $2,000 named in the contract.

BILL IN EQUITY, filed October 20, 1894, against Edgar O. Silver, said Silver, Henry C. Deane, Elmer E. Silver, and Frank W. Burdett, " now or lately copartners " under the firm name of Silver, Burdett, and Company, Silver, Burdett, and Company, a corporation, and John W. Tufts, alleging the following facts.

In the four years prior to September 1, 1886, the plaintiff and the defendant Tufts, as joint authors, composed, prepared, and edited a series of books and charts for instruction in music, especially designed for use in public schools and educational institutions, all of which bore the general title of the " Normal Music Course." These books and charts were composed, printed, electrotyped, and published under an agreement between the plaintiff and Tufts, associating themselves together for the purpose of editing and publishing such works, and declaring themselves equal owners of the copyrights of the books and charts and of the plates, and agreeing to continue the editing and publishing of the remaining books and charts of the course, sharing the cost and dividing the profits equally. The plaintiff and Tufts were equal owners in all the books and charts, and the copyrights thereof, and had paid equally the cost of the electrotype plates therefor.

In February, 1883, the plaintiff and Tufts made a contract in writing with D. Appleton and Company, leading publishers in New York City, for the publication of their proposed series of musical books and charts, which contract gave to the publishers the exclusive right of publication for the whole term of copyrights and renewals. Down to March 28, 1885, D. Appleton and Company, as assigns of the plaintiff and Tufts, entered the titles of the books up to that date composed in the office of the Librarian of Congress, and did all other acts and things required by law for securing, perfecting, and maintaining the copyrights on the books.

On or about March 28, 1885, the plaintiff, with the consent and at the request of Tufts, purchased of D. Appleton and

Company, for the sum of $6,200, paid wholly by himself, all the interest of D. Appleton and Company in the plates and good will of the Normal Music Course or Series, and also, for the sum of $3,871.26, all the stock of the series or books remaining in the hands of D. Appleton and Company, the latter directing that all the plates and stock on hand at their store and at their several agencies be delivered to the plaintiff immediately, or upon his order.

In this way, and by the consent, understanding, and agreement of Tufts, the plaintiff succeeded to the rights held by D. Appleton and Company as sole publishers of the series, under the contract with them, and for the term named therein; and the plaintiff became the sole publisher of the series of books and charts from that date, and alone continued the publication and sale of the same as had been done by D. Appleton and Company. After his purchase from them of their publishing interest and rights and their stock of books, the plaintiff, in carrying on the publishing of the series, expended very large sums of money in the introduction, advertising, and sale of the publications above the sums he received, before September 1, 1886.

During this time, from March 28, 1885, to September 1, 1886, while the plaintiff alone was publishing the series, he and Tufts continued to labor as co-authors, and wrote, edited, and prepared certain of the books included in the Normal Music Course.

On or about September 1, 1886, the plaintiff and the defendant Edgar O. Silver entered into a contract in writing, which recited in the first article that the plaintiff, " as he is joint author" with Tufts of certain publications known as the Normal Music Course, " and coequal owner of the copyrights and electrotype plates, etc." of these publications, " and as he is also at present the sole publisher of the same," agrees that Silver " shall have the exclusive right to print and publish the said series during the term of three years from the date hereof, with the use of all capital invested, appliances, and the like, heretofore used by him in said publishing business; that he will not, without the consent in writing of said Silver, write, print, or publish, or cause to be written, printed, or published during the continuance of this agreement, any other edition of the said series,

revised, corrected, or enlarged, abridged, or otherwise, or of any series or books of a similar character tending to interfere with or injure the sales of the said series of music books "; in the second article Silver agrees to print and publish the same, to pay all expenses of such printing and publishing, and to pay the plaintiff " a sum of money equal to not less than five or more than fifteen per cent, as may be agreed upon, on the net proceeds of said publications, it being understood that such net proceeds are the receipts from all sales after deducting fifteen per cent therefrom as the sum due to said Holt and said Tufts as joint authors and coequal owners of the copyrights and electrotype plates, etc., as well as the cost of manufacture; and that he will contribute the sum of two thousand dollars as further capital to be secured by said Holt, and returned to said Silver at the termination of this agreement "; and in the third article, that the plaintiff and Silver agree " that to terminate this agreement at the end of three years from the date hereof a notice in writing must be given thirty days at least before the expiration of the first year from the date hereof, and that in default of such notice at the end of the first year a period of one year shall be added to the term of this agreement, and also that in default of such notice at the end of the second or any succeeding year a further period of one year shall be added to the term of this agreement as then existing, so that in any event this agreement cannot be terminated absolutely until the end of two years after that year in which such notice may be given."

At or about the same time, another contract, bearing the same date, was entered into between Tufts, the plaintiff, and Silver, in which Tufts and the plaintiff, as joint authors and coequal owners of the copyrights, electrotypes, etc., of the Normal Music Course, agreed that Silver should have the exclusive right of publication of the same, upon terms therein stated, for the same time as was agreed to in the contract last mentioned, and in which Silver agreed to print and publish the same and pay all expenses of such printing and publishing, and to render annually on the first day of February to Tufts and the plaintiff a statement in writing of the number of copies of the series printed and sold to the first day of January next preceding, and thereupon to pay to Tufts and the plaintiff a sum of money equal to

fifteen per cent of the net wholesale prices of the publications, to be determined in a specified manner, and containing a provision as to termination of the contract by notice similar to that in the other contract, and also a similar provision as to the publication of competitive books.

Subsequently to September 1, 1886, Tufts and the plaintiff prepared new and revised editions of some of the before mentioned publications, and added others to the same.

Silver received all the assets and accounts previously belonging to the plaintiff and used in the publication, and entered upon the publication and introduction of the books in various schools and cities of the United States, and made payments to the plaintiff and Tufts of the fifteen per cent upon net wholesale prices, as specified in the agreement, and to the plaintiff of five per cent upon the net proceeds of the publications, under the terms of the agreement between them.

During such publication Silver associated with himself one Rogers, under the firm name of Silver, Rogers, and Company, and continued the publication of the books. At the time when Rogers was admitted to the firm he was fully informed of the terms upon which Silver was publishing the works, and was familiar with the contracts hereinbefore specified. Thereafter Rogers retired from the partnership, and the defendants Burdett, Deane, and Elmer E. Silver became members thereof in the place of Rogers, and the name of the firm became Silver, Burdett, and Company. At the time Burdett, Deane, and Elmer E. Silver entered into such partnership they were familiar with all the terms of the agreements hereinbefore referred to, and as members of the firm with Edgar O. Silver entered upon and proceeded to perform the same ; and the plaintiff did not object to the admission of Burdett, Deane, and Elmer E. Silver to the partnership, or any of them, or to their interest in the publication under the contracts, but accepted them as joint publishers with Edgar O. Silver and bound by the terms of the agreements; and the copartners of Edgar O. Silver, as they successively became such, adopted, and thereby agreed to fulfil, the undertakings and agreements of Edgar O. Silver contained in the contracts above mentioned.

The firm of Silver, Burdett, and Company made statements

of the number of books sold, and of the percentages to which Tufts and the plaintiff were entitled under such contracts, and made payments to the plaintiff in accordance with such statements, down to the year 1893.

The copyrights upon the first books published in the Normal Music Course Series were in the names of Tufts and the plaintiff, and upon some of the later publications and revisions in the name of Silver, Rogers, and Company, and of yet later ones in the name of Silver, Burdett, and Company. The plaintiff is unable to state in what name or names each particular book as last published may have been copyrighted, but says that the copyright of every book and chart hereinbefore mentioned belongs one half to himself, and one half to Tufts, or the assigns of Tufts, in whosesoever name or names the same may have been obtained.

On or about December, 1890, Tufts, without the knowledge or consent of the plaintiff, and in violation of good faith as well as of his express agreement with the plaintiff, conveyed all his interest in the Normal Music Course, and in all the electrotypes, plates, and cuts belonging to the authors of such publications, to Edgar O. Silver, either alone or in conjunction with his copartners, all of whom knew that such conveyance was in conflict with the terms of the agreement and of the relations subsisting between Tufts and the plaintiff.

In or during the years 1891 and 1892, Tufts composed or arranged, and the other defendants published and placed upon the market, another series or course of musical instruction, consisting of four books called the " Cecilian Series of Study and Song." Such series is a rival and competing course, and its publication is in violation, on the part of the defendants, of the contracts hereinbefore mentioned made by the parties in relation to the publication of the Normal Music Course.

At some time not long prior to March, 1893, the individuals and copartners made defendants in this case caused themselves to be incorporated under the laws of the State of New Jersey, under the name of Silver, Burdett, and Company. In further violation of their agreements and of the course of such publication, the firm of Silver, Burdett, and Company then conveyed or attempted to convey to the corporation all the copyrights

upon the works composing the Normal Music Course, all the plates, dies, etc., used in its publication, and all the bound stock and materials, and the rights of publication, resulting from their agreements.

The plaintiff was not informed of this transfer until March, 1893, when he was apprised of the same at the time of receiving the annual sum due him for copyrights. He immediately and in writing notified the defendants of his astonishment at the transfer, or attempted transfer, and that he did not assent to but protested against the same, and to the publication of the series by the corporation, as an abandonment of the contracts made by Edgar O. Silver.

The defendants have paid no heed to the plaintiff's protest or rights under the contracts, all of which are personal and not assignable; but the corporation is at the present time, and ever since January 1, 1893, has been, publishing and selling the Normal Music Course as had before been done by the firm of Silver, Burdett, and Company, and has made even greater sales of such works than were made by the firm in any equal length of time, all without regard to the plaintiff's rights therein, or to his dissent and protest, and without reporting to him in any respect since the beginning of the year 1893.

On July 26, 1892, the plaintiff gave to the defendant Silver, and to the defendant copartners, Silver, Burdett, and Company, the following notice:

" You are hereby notified that I do elect to terminate, and hereby do terminate and end, in two years from the first day of September next, ' a certain written agreement or obligation' made by and between myself, as the publisher of the Normal Music Course, so called, and said Edgar O. Silver, dated September 1, 1886, and also a certain other written agreement or obligation, also dated September 1, 1886, made by and between said Silver as one party, and John W. Tufts and myself, being the joint authors and then coequal owners of the copyright, etc. of said Normal Music Course; both said agreements or obligations having reference to the publication of said Course, so called, and being all the written agreements between said Silver and myself, either alone or with Mr. Tufts, relating to said Normal Music Course and the publication thereof in any way.

" This notice is given to unquestionably terminate said written agreements, contracts, or obligations, as provided in terms in the' same, and is given by me alone, because said Tufts has no longer any ownership or interest in said Normal Music Course, or the copyrights, plates, or attending properties thereof; and by giving this notice I do not admit or intend to concede that either of said written obligations has not been already violated, superseded, and abandoned by said Silver or said Tufts, or both of them, so as to release me therefrom, and I do not waive such violations and abandonment."

Under the " Holt-Silver contract," it has never been agreed by the parties what the percentage between five and fifteen to be paid the plaintiff on the net proceeds of the publications should be; but the defendant copartners paid the plaintiff annually five per cent, and no more, for the time which ended January 1, 1893. For the time subsequent to January 1, 1893, nothing has been paid to the plaintiff under the contract, and no statement of account has been rendered, and no accounting has been had whatsoever.

Under the " Tufts-Holt-Silver contract," the plaintiff received from the defendants his one half share of the fifteen per cent agreed upon as copyright money, with annual statements, as in the contract provided, up to the 1st of January, 1893, and has received no statement of the number of copies of the series printed, or of the number of copies thereof sold, or any account, or any money whatever, for any time since such date, under the contract, the report and payment to him up to that date having been made in March, 1893.

The plaintiff is advised that, as well by the acts of the defendants as by the force and terms of the notice, the contracts heretofore existing between him and the defendants, or any of them, were terminated, and that a settlement of accounts under the contracts, and disposition of the assets used in the publication business, alone remain to be made between the parties to this cause. Upon the termination of the contracts between him and the defendants, the sole right of publication of the Normal Music Course and Series revested in the plaintiff.

Under the " Holt-Silver contract," he is entitled to receive at least five per cent on the net proceeds of all the publications

constituting the series, to be computed as in the contract provided, resulting from the sales and business of the defendants since January 1, 1893, and to an accounting and adjustment respecting what in the contract is called " capital," contributed by himself and by Edgar O. Silver in the business.

Under the " Tufts-Holt-Silver contract," he is entitled to receive in money one half of fifteen per cent of the net wholesale prices of the publications, to be computed as in the contract provided, with statements of the number of the books printed and the number of books sold by the defendants since January 1, 1893 ; and he is the owner of an undivided half, with the defendants, of the electrotype and other plates used in printing and preparing the publications, all in the hands of the defendants.

The prayer of the bill was that it be adjudged and decreed that the contracts called the " Holt-Silver contract" and the " Tufts-Holt-Silver contract" were terminated on September 1, 1894, and that the plaintiff and Tufts, or his assigns, are co-equal owners of the copyrights of all the books and charts constituting the Normal Music Course, and that the plaintiff has the sole right of publishing the same for the term named in the contract of D. Appleton and Company ; that the defendants other than Tufts be ordered to pay to the plaintiff five per cent of the net proceeds of all the publications constituting the Normal Music Course, original or revised, to be computed as provided in the second section of the " Holt-Silver contract," from January 1, 1893, to September 1, 1894, or the termination of the contract; that the defendants other than Tufts be ordered to render to the plaintiff a statement in writing of the number of copies of the series of books and charts printed, and also of the number of copies thereof sold, from January 1, 1893, to September 1, 1894, or until the termination of the contract, and to pay to the plaintiff one half of fifteen per cent of the net wholesale prices of the publications, such prices to be computed and such payment to be made as provided in the " Tufts-Holt-Silver contract," and to deliver to the plaintiff the electrotype and other plates of the publications ; and that the defendants be permanently enjoined from publishing or selling any of the books and charts constituting the Normal Music Course or

Series, in order that the plaintiff might resume the publication of the same alone, and account to Tufts or his assigns for his portion of the copyright money or percentage, as provided in the contract of Tufts and the plaintiff with D. Appleton and Company.

The defendants filed a plea and demurrer to the jurisdiction, on the grounds that a suit brought by the present defendants against the present plaintiff, and involving the same subject matter as that of the present suit, was pending in the Circuit Court of the United States for this district; and that the present suit was based upon the copyright laws of the United States, and was exclusively within the jurisdiction of the courts of the United States. The plea and demurrer were overruled; and the defendants appealed to the full court.

The case then came on to be heard, and an interlocutory decree was entered, adjudging that the contract made by the defendant Tufts and the plaintiff with D. Appleton and Company was cancelled by the parties, and not assigned by D. Appleton and Company, and that no other contract was made which would give to the plaintiff the exclusive right of publishing the Normal Music Course ; that the contracts made between the plaintiff and the defendant Edgar O. Silver, and between Tufts and the plaintiff as parties of the first part, and Silver as party of the second part, were terminated on September 1, 1894, by the notice given to Silver and to Silver, Burdett, and Company, in July, 1892; that the plaintiff on the one hand, and the defendant Edgar O. Silver as the assignee and equitable owner of the interest of Tufts on the other hand, were respectively each the owner of one half of each and all of the copyrights of all· the books and charts constituting the Normal Music Course, and that each half owner had an equal right of publishing under such copyrights ; and the defendants were ordered to transfer, assign, and convey to the plaintiff one half of each and all of such copyrights standing in their names or in the name of either of them ; that the contracts did not debar the defendants from the right of publishing the Cecilian Series of Study and Song, written by Tufts, and published by the other defendants ; that the publication and sale by the plaintiff, to the extent which was done, of his book and charts entitled " H. E. Holt's New and Improved

Normal Course in Music, First Reader," and charts published under the general title or as a part of H. E. Holt's New and Improved Normal Course in Music, before the termination of the contracts on September 1, 1894, was such a breach of the contracts as would be a ground of recoupment in an accounting for copyright percentages under the contracts, but not such a breach or wrong as would deprive the plaintiff of the benefit of his notice to terminate the contracts; and referring the case to a master, to state the amounts due to the plaintiff from the defendants, or either of them, under the contracts dated September 1, 1886, stating the amount due to September 1, 1894; to state the amount of injury sustained by the defendants prior to September 1, 1894, from the publication by the plaintiff of the book entitled " H. E. Holt's New and Improved Normal Course in Music, First Reader," and his charts, or other breach of the contract; and to state the number of sets of stereotype plates in the possession of the defendants, and used in or for the publication of the Normal Music Course, and the value thereof.

From this decree the defendants appealed to the full court.

The master found and reported the following facts.

· The plaintiff, in conjunction with the defendant Tufts, was an author and joint owner of a series of music publications, consisting of nine books, graded from a first reader for children to a manual for teachers, and two sets of charts, all of which constituted what was called " The Normal Music Course." The series was designed to embody a system of teaching music invented by the plaintiff, originally set forth in the books and charts, but afterwards more or less changed by the plaintiff. The defendant Silver was a publisher, whose rights under the contracts referred to in the bill had been assigned to a corporation known as Silver, Burdett, and Company.

From the transactions between the plaintiff and this corporation under these contracts, it appears that the plaintiff assented to this assignment so far as to make him responsible to the corporation for any breach of the contracts on his part, and the corporation is responsible to the plaintiff for the royalties due under them.

A notice to terminate was given by the plaintiff in July, 1889, but this was subsequently waived. On July 26, 1892, he gave

another notice to terminate the contract upon September 1, 1894, which was not waived.

The defendant Silver, upon December 10, 1890, purchased the interest of the defendant Tufts, which purchase gave to him an equal right with the plaintiff to publish under the copyrights, and entitled him to seven and one half per cent of the net wholesale price under the " Tufts-Holt-Silver contract."

Subsequently to September 1, 1894, the date of the expiration of the contract, the defendant Silver, Burdett, and Company continued to publish and is still publishing the series by virtue of the authority given to it under the assignment by Tufts of his interest in the copyrights; and still has in its possession and uses the sets of stereotype plates formerly paid for and owned jointly by the plaintiff and the defendant Tufts.

The amount of royalties due to the plaintiff up to September 1, 1894, was $7,488.25.

At the request of the defendants, the master found that the amount of royalties due the plaintiff upon August 1, 1893, at which time the first edition of the plaintiff's alleged infringing book was published, was $1,677.70.

The evidence in support of the defendant corporation's contention that the plaintiff had broken his contract with it, and that it was therefore entitled to damages by way of recoupment, was substantially as follows.

The plaintiff commenced work in the spring of 1893 upon the preparation of a new First Reader, over eighty per cent of which was in and taken from the original publication, being assisted in his work by a well known professor of music. The plaintiff had printed one edition of 1,053 copies of this reader prior to August 1, 1893, and a second edition of 2,000 copies between August 1, 1893, and January 1, 1894. Of the total edition of 3,053 copies, 2,054 copies were sold by him between September 14, 1893, and September 1, 1894, the balance not being disposed of in any way prior to September 1, 1894. Of this number sold, about 100 were exchanged at Lexington for the First Reader of the Normal Music Course.

Some time in 1892 the plaintiff invented and had printed three so called drill charts; these consisted of three sheets bound with the sheets in the book of charts. These new drill

charts were invented to carry out different new ideas. They were made for the Normal Music Course, and were not competing charts. In addition, however, to these drill charts, the plaintiff had printed other sheets, one half of the material of which was in the old chart.

Of the bound sheets called " Book of Charts," he had printed 511 copies, which were delivered to him in October, 1893. In the summer of 1893 he had received a few specimen pages of the new chart, some of which he exhibited in Chicago later in the same year to one of the leading public school music teachers, and which he had used in his teaching. Of the 511 sets of charts, the plaintiff sold 100 copies prior to September 1, 1894, the rest of the edition remaining in his possession.

The purchasers of the books and the charts consisted of music teachers, school committees, booksellers, and others, who resided in various parts of the country.

There was also evidence that as early as 1890 the plaintiff had spoken about getting out a new course, and from 1891 to 1893 there was a general understanding among the possible purchasers of the series that he was to get out a new course.

It further appeared in evidence that three or four pages of the new book were distributed before its publication to seventy-five or one hundred of the plaintiff's pupils to help them in the study of intervals ; and that in 1891 circulars had been printed and distributed by the plaintiff announcing the opening of his summer and winter schools, and calling attention to the plaintiff's " New and Original Normal System of Teaching Vocal Harmony."

The plaintiff testified that he was continually improving his method and system of teaching, and that the changes of the charts and books were necessary in order to carry out his latest ideas; that the old charts were still in use in the Boston schools; that he had never advertised his new course, or had it reviewed, nor had he put any of his publications on public sale, and that he had not commenced the preparation of his book until the spring of 1893 ; that he always advocated and used the old course, even after September 1, 1894, in his summer schools; and that the copies so used were furnished by the defendants.

The defendant corporation contended that the plaintiff was

responsible in damages, not only for the writing, printing, and publishing of the book and charts, but also for the general understanding among possible purchasers of a future publication by him of a rival book, which understanding was caused by the wide dissemination of his books and charts, and by his oral utterances from the platform, and which resulted in a decreased sale of the books and charts published under the contracts.

" It is evident from the evidence that the plaintiff did break his contract in writing, printing, and publishing 3,000 copies of the First Reader, and 511 copies of the chart referred to, prior to September 1, 1894; and I so find.

" It may also be true that he broke his contract with the defendant corporation in exhibiting the advance pages of his new chart and book, or in publishing them in any way. But, so far as such actions were concerned, the defendant corporation did not satisfy me that it had or could have been damaged in any way thereby. The publication of the circulars was not a breach of the contract, as they referred to a system of teaching, and not to any publication connected with the Normal Music Course, and the plaintiff was under no obligation to desist from improving his method of teaching, and of advertising the same.

" The defendant corporation did not satisfy me that the general understanding among possible purchasers of the series, from 1891 to 1893, had reference to the publication of the plaintiff's new book before September 1, 1894, (and he had a legal right to publish after September 1, 1894, and to advertise the same,) or that the plaintiff was in any way legally responsible for such understanding. According to the evidence, I find, therefore, that the plaintiff had done nothing in violation of the contract until the spring of 1893, when he commenced work upon the new First Reader and chart."

The defendant corporation contended that the damages to which it was entitled by reason of the plaintiff's action should be measured: 1. By loss of profits upon sales of the new series admitted to have been made by the plaintiff, and estimated by the defendant corporation at $941.67. 2. By the damage to the interest of the defendant corporation in the Normal Music

Course as a publishing property, estimated at $7,222.26. 3. By the loss of profits, January 1 to September 1, 1894, due to falling off in sales, estimated at $3,232.72. 4. By the extra expense to the defendant corporation incurred during the period prior to September 1, 1894, while the plaintiff was preparing, printing, and publishing his new publication, on account of the efforts of employees to counteract the damaging effects due to the plaintiff's actions and rumors thereof, estimated at $6,206.09. 5. By the extra expense in the employment of a special expert from February 1, 1891, to September 1, 1893, necessitated in order to protect the interest of the defendant corporation in the Normal Music Course from the doings of the plaintiff during that period, in preparing, printing, and publishing a new edition, estimated at $6,192.66. 6. By the expense incurred in maintaining summer schools in 1892, 1893, and 1894, for the same purpose, estimated at $3,327.56. 7. A further sum of $2,000 was claimed under article two of the " Holt-Silver contract."

Evidence bearing upon the second, third, fourth, fifth, and sixth claims was admitted, and the master found as follows:

" 1. The defendant corporation is undoubtedly entitled to loss of profits upon the admitted sales, that is, 2,054 books and 100 charts. In estimating these profits I have adopted the rule generally accepted in ascertaining common law damages for breach of copyright; that is, the plaintiff is to account for every copy of his book and chart sold as if it had been a copy of the defendant corporation's, and to pay the defendant corporation the profit which it would have received from the sale of so many additional copies. The total amount of profit upon the 2,054 books sold I find to be $323.50, and upon the charts sold, $539.

" 2. The defendant corporation is not entitled to any damages for injury to its property as publishing property. The damage claimed was the diminution in the market value of the property as publishing property upon September 1, 1894, caused by the falling off in the profits shown to have been incurred during the year 1894 prior to September 1, and claimed to have been due to the plaintiff's action. The rights of the defendant corporation to publish under the contract ceased upon September 1, 1894. The defendant corporation had a right to publish after

September 1, 1894, acquired from Tufts, but the plaintiff was under no obligation to Tufts, nor liable under the contract, for any damage to his right to publish. I find, therefore, as matter of law, that there was no market value upon September 1, 1894, of the right to publish under the contract, and that therefore there was no damage to the market value of the publishing rights as a piece of property. Even assuming that there was such a market value, and that it was damaged, the defendant corporation did not satisfy me that the decrease was in any way due to the actions of the plaintiff. The decrease was based upon the falling off of the sales in 1894, as compared with the average rate of increase of sales in the years preceding. In two of the preceding years the sales had decreased through no fault of the plaintiff, and for no given reason.

" 3. The defendant corporation is, for the reasons above given, not entitled to any loss of profits upon sales which would have been made had the same ratio of increase continued during the year 1894 as held on the average for the years preceding, during which the contract was in force.

" 4 and 5. The defendant corporation is not entitled to recover for extra expense during the period up to September 1, 1894, claimed to be due on account of services of regular employees, or of the special expert, in counteracting the damaging effect alleged to be due to the plaintiff's actions, and rumors thereof. As has already been found, the plaintiff was not legally responsible for such rumors; but if he had been responsible, the defendant corporation failed to satisfy me that such expense was reasonably necessary to protect its interests under the contract against any action of the plaintiff, or was a natural or probable result of any breach of the contract.

" 6. The defendant corporation is not entitled to expense incurred in maintaining summer schools, for the reasons above mentioned.

" 7. The defendant corporation is not entitled to recover the $2,000 referred to in the ' Holt-Silver contract.' It was contributed by the defendant Silver as further capital ; was to be ' secured ' by the plaintiff, and was to be ' returned ' at the termination of the agreement. At the time when the contract was made, the plaintiff supposed, as appears upon the face of the con-

tract, that he had the sole right to publish. In my opinion, the parties then contemplated that upon the termination of the contract the sole right to publish would return to the plaintiff. If this had been the result, it is apparent that the $2,000 extra capital which had been used in extending the business of publishing the series, and which to that extent had increased the value of the right to publish, would have inured to the plaintiff's sole benefit. The sole right to publish did not return to the plaintiff. The defendant corporation, by virtue of the assignment from Tufts, continues to publish the series, and is receiving the benefit of the $2,000 extra capital, so far as it has increased in value the right to publish jointly with the plaintiff. He does not therefore seem to me to be entitled to receive the $2,000."

The only evidence as to the number of sets of stereotype plates in the possession of the defendant corporation, and their value, used in and for the publication of the Normal Music Course, consisted of estimates of an expert who had examined the plates; and the details of these estimates were recited in the report.

Annexed to the master's report was a partial report of the evidence offered before him by the defendants " upon the question of recoupment of damages," and the printed record also contained a condensed report of evidence " relating to the validity of the notice given by the plaintiff to the defendants to terminate the Holt-Silver contract and the Holt-Tufts-Silver contract," and " relating to the transfer to the defendant corporation of the rights of Edgar O. Silver under said contracts," being all the evidence " which the parties desire to have reported."

The defendant Silver, among other things, testified as follows:

" *Q.* Now, by reason of the writing, printing, and publishing by Mr. Holt of his new publication prior to September 1, 1894, was your house involved in expense in the way of salaries and travelling expenses of agents or otherwise ? *A.* We were obliged to increase those expenses by a considerable amount.

" *Q.* What expenses are directly attributable to the action of Mr. Holt? *A.* In the first place, the regular agents and representatives of the house were called upon to devote a considerable

amount of their time to making extra journeys, and to carrying on a large amount of extra correspondence, by reason of the fact that they came constantly in contact with the impression in the minds of customers of the house and others that Mr. Holt had begun to publish a revised and improved edition of the Normal Music Course.

" *Q*. Well, now, can you estimate the additional expenses and salaries which you were put to? *A*. Well, as I have figured, the extra expenses, that is, salaries and travelling expenses, etc., of Silver, Burdett, and Company during the period when Mr. Holt was preparing, printing, and publishing his new publication prior to September 1, 1894, which were incurred on account of the efforts of the regular agents and employees to counteract the effect of the impression which was spread abroad, and to protect the Normal Music Course from damage on that account, amount to — leaving out very many items which I think were actually matters of expense directly due in that way — $6,206.

" *Q*. Did you employ any special persons, or make any special efforts, outside of the ordinary business efforts which the house would make, to meet this publication of Mr. Holt; if so, whom did you employ, and what did you do? *A*. In addition to the efforts of our regular agents and representatives and employees, we employed Professor Russell from February 1, 1891, to September 1, 1893, I think; we also carried on summer schools for the instruction of teachers on lines similar to those which Mr. Holt was carrying on in his own classes.

" *Q*. Was Professor Russell employed and were your summer schools instituted by reason of Mr. Holt's publication? *A*. Professor Russell was employed entirely because we were told that Mr. Holt was preparing and about to publish this, and the summer schools were started for the same reason, and have been continued ever since."

On the question of market value, the defendant Silver put in the following evidence: " This diagram shows the whole length of time of the duration of the contract, beginning September 1, 1886, and assuming that it terminated September 1, 1894. The first full copyright year began January 1, 1887; during that year the royalties amounted to $1,363.96, and as that figure

would be exactly fifteen per cent of the net sales, assuming that the sales were made at wholesale prices, and reckoning those sales made at wholesale prices, the net sales for that year would have amounted at that rate to $9,093.06. For the next copyright year, 1888, the copyright royalty amounted to $1,274.60, a very slight falling off, and the sales, on the basis of the wholesale price, amounted to $8,497.33. For the next copyright year, 1889, the copyright royalties amounted to $2,718.66, and the sales to $18,124.60. For the next copyright year, 1890, the royalties were $3,209.55, and the sales were $21,397. For the next copyright year, 1891, the royalties were $4,529.48, and the sales were $30,196.53. For the next copyright year, 1892, the royalties show a very slight falling off, being $4,451.99, and the sales amounted to $29,679.93. For the year 1893 the royalties amounted to $7,692.57, and the sales to $51,283.80. For the year 1894, the next full copyright year, the royalties amounted to $6,580.64, and the sales amounted to $43,870.93."

The defendants filed seven exceptions to the master's report, all of which, at the hearing before *Allen*, J., were overruled, except the seventh, which was sustained, and was as follows: " The master erred in finding that the defendants were not entitled to recover the $2,000 referred to in the ' Holt-Silver contract,' for the reason that, having found the said sum of $2,000 had been contributed by the defendant Silver in accordance with the terms of the contract, he should have found that upon the termination of the contract the defendant was entitled to a return of the said $2,000 in accordance with the provisions of the contract."

A final decree was thereupon entered, adjudging as follows.

1. That the contract made by the defendant Tufts and the plaintiff with D. Appleton and Company was cancelled by the parties, and not assigned by D. Appleton and Company; and that no other contract was made which would give to the plaintiff the exclusive right of publishing the Normal Music Course.

2. That the contracts made between the plaintiff and the defendant Edgar O. Silver, and between Tufts and the plaintiff, as parties of the first part, and Silver as party of the second part, were terminated on September 1, 1894, by the notice given to Silver and to Silver, Burdett and Company in July, 1892.

3. That the plaintiff on the one hand, and the defendant Edgar O. Silver as the assignee and equitable owner of the interest of Tufts .on the other hand, are respectively each the owner of one half of each and all of the copyrights of all the books and charts constituting the Normal Music Course, and that each half owner has an equal right of publishing under such copyrights.

4. That the defendants and each of them are ordered to transfer, assign, and convey to the plaintiff one half of each and all of such copyrights standing in their names or in the names of either or any of them.

5. That the publication and sale by the plaintiff to the extent which was done of his books and charts entitled ".H. E. Holt's New and Improved Normal Course in Music," and of charts published under the general title or as a part of " H. E. Holt's New and Improved Normal Course in Music," before the termination of the contracts on September 1, 1894, was such a breach of the contracts as would be a ground of recoupment in an accounting for copyright percentages under the contracts, but not such a breach or wrong as would deprive the plaintiff of the benefit of his notice to terminate the contracts; and that the defendants are entitled to recoup the sum of $862.50, together with interest from September 1, 1894, amounting on May 1, 1896, to $86.26, namely, $948.76.

6. That the plaintiff is entitled to recover royalties and percentages from the defendants, other than and excepting the defendant Tufts, under said contracts, with interest thereon to May 1, 1896, amounting to $8,405.02.

7. That the plates from which the books and charts of the Normal Music Course were printed are of the value of $2,877.68, to one half of which value the plaintiff is entitled; and that the defendants other than Tufts pay to him one half of such value, namely, $1,438.84, with interest from September 1, 1894, such interest amounting, on May 1, 1896, to $143.88, making the entire sum of $1,582.72.

8. That the seventh exception of the defendants to the report of the master be sustained, and the defendants recover of the plaintiff, under the second paragraph of the " Holt-Silver contract," the sum of $2,000, with interest thereon from Sep-

tember 1, 1894, such interest to May 1, 1896, amounting to $200, and making a total of $2,200 ; and that all the other exceptions to said report be overruled.

9. That the defendants, excepting the defendant Tufts, pay to the plaintiff the sums hereinabove awarded him, less the recoupment and $2,000 item, to wit, the sum of $6,838.98, together with his costs of suit.

The defendants appealed from this decree, and the plaintiff also appealed from the eighth clause thereof, to the full court.

The case was argued at the bar in December, 1896, and afterwards was submitted on briefs to all the justices.

*A. Hemenway & A. Lord*, for the defendants.

*S. J. Elder & A. S. Hall*, (*E. A. Whitman* with them,) for the plaintiff.

LATHROP, J.  1. The defendants' plea and demurrer to the jurisdiction of the court were rightly overruled.  The suit is in effect one for breach of contract, and to compel an account and a performance of the provisions of the contract in other respects. There is no doubt that the State courts have the power, and it is their duty, to decide any federal question arising collaterally in respect to the existence or validity or construction of a patent. *Nash* v. *Lull*, 102 Mass. 60.  *David* v. *Park*, 103 Mass. 501. *Binney* v. *Annan*, 107 Mass. 94.  The fact that the contracts were terminated when the bill was brought makes no difference, because there were rights accruing under them to be determined and enforced.

2. The defendants contend that the notice dated July 26, 1892, given by the plaintiff alone, was insufficient to terminate the contract, because the defendant Tufts did not join in giving it.  But at that time Tufts had no interest in the contract, since, by the procurement of the defendant Silver, Tufts had assigned his interest to him.  The defendant Silver, therefore, by his own act had put it out of the power of Holt to comply literally with the provisions of the agreement as to notice, and the other defendants, holding by assignment from him, stand in no better position.  *Eliot National Bank* v. *Beal*, 141 Mass. 566, 568. *United States* v. *Peck*, 102 U. S. 64.  To oblige Holt, under the circumstances, to show that Tufts had refused to join in the notice is unnecessary in order to do equity between the plaintiff

and the defendants. They should not be heard to complain or to insist on a formality which they have rendered impossible of performance, or at the best entirely unnecessary.

3. The master has found that the defendants are entitled to recoup the profits made by Holt on the sales made by him in violation of the Holt-Silver contract under the following rule of damages. The plaintiff is to account for every copy of his book and chart sold as if it had been a copy of the defendants', and to pay to the defendants the profits which they would have received from the sale of so many additional copies. This finding and ruling was not excepted to by the defendants, and has not been objected to by them on appeal. The defendants, however, put in evidence before the master to show further damages, and various questions arise upon their exceptions relating thereto.

We have no occasion to consider in this case whether, if the profits are accepted, further damages can be allowed. See *Neilson* v. *Betts*, L. R. 5 H. L. 1, 22; *De Vitre* v. *Betts*, L. R. 6 H. L. 319, 321; *Livingston* v. *Woodworth*, 15 How. 546; *Elizabeth* v. *Pavement Co.* 97 U. S. 126, 139; *Callaghan* v. *Myers*, 128 U. S. 617, 665.

In regard to the amounts claimed by the defendants for extra expenses for services of employees, experts, maintaining summer schools, etc., the master has found that the expenditures were not reasonably necessary, and not a natural result of the breach of contract. It further appears, from the testimony of the defendant Silver, that these expenditures were caused in greater part by apprehension of injury based upon mere rumors. Such expenses are not recoverable as damages. *Sibley* v. *Hoar*, 4 Gray, 222. Moreover, on the evidence, it does not clearly appear that there was a mistake or error in the findings of the master on these points.

The master found that there was no market value of the right to publish under the contract on September 1, 1894. On that day the contract was terminated, and there was no further right to publish under it. It further appears that the master found that, assuming that there was a market value, any decrease in such value was not due to the act of the plaintiff. The evidence of market value offered by the defendant Silver was based on

the computation of the annual increase in value. This increase was shown as a fact not to be constant, for in two years out of seven there was an actual decrease rather than an increase. It cannot be said, therefore, that the master was clearly in error when he found that the decrease in 1894 was not shown to be due to the breach of contract by the plaintiff.

The same kind of evidence was offered to show loss of profits. The master found that he was not satisfied by the evidence that the loss of profits in 1893–94 was caused by the acts of the plaintiff. While some loss of profits may have been caused by the plaintiff's acts, yet this was a matter for the master to determine as a fact; and it cannot be said that he erred in finding that the evidence did not prove that the damage claimed resulted from the acts of the plaintiff.

4. It is contended by the defendants that the breach of the contract by the plaintiff should deprive him of any right to recover royalties accruing subsequently to such breach, and before September 1, 1894. The master and the single justice ruled otherwise. It is a sufficient reason for refusing to disturb their ruling that all the evidence on this point is not before us. The evidence annexed to the master's report is admittedly incomplete, and most of it is expressly stated to be on other points. It is impossible, therefore, for us to reverse the rulings made.

5. The remaining question is as to the sum of two thousand dollars which it is contended, by the terms of the contract made on September 1, 1886, between Holt and Silver, was payable by the former to the latter at the termination of the contract. In the first article of this contract it is recited that Holt is joint author with Tufts of certain publications known as the Normal Music Course, and coequal owner of the copyrights, electrotype plates, etc. of these publications, and that he is at present the sole publisher of the same. He then agrees that Silver is to have the exclusive right to print and publish the same during three years from the date of the contract, with the use of all capital invested, appliances, and the like, theretofore used by him in said business. In the second article Silver agrees to do the publishing and pay all expenses of printing, and to pay Holt a sum of money equal to not less than five or more than fifteen

per cent, as may be agreed upon, on the net proceeds of the publications, "it being understood that such net proceeds are the receipts from all sales after deducting fifteen per cent therefrom as the sum due to said Holt and said Tufts as joint authors and coequal owners of the copyrights and electrotype plates, etc., as well as the cost of manufacture; and that he will contribute the sum of two thousand dollars as further capital to be secured by said Holt, and returned to said Silver at the termination of this agreement." By the third article Holt and Silver agree that to terminate the agreement at the end of three years from the date thereof, a notice in writing must be given thirty days at least before the expiration of the first year from the date, and that in default of such notice at the end of the first year, the period of one year shall be added to the term of the agreement, and also that, in default of such notice at the end of the second or any succeeding year, a further period of one year shall be added to the agreement as then existing, so that in any event the agreement cannot be terminated absolutely until the end of two years after that year in which such notice may be given.

On December 10, 1890, Silver purchased the interest of Tufts, and the notice given by the plaintiff to terminate the contract was dated July 26, 1892. It is contended that the defendant Silver is not entitled to recover the two thousand dollars referred to in the contract of September 1, 1886, because the plaintiff supposed that he had the sole right to publish, as appears from the contract itself, and that it was contemplated that upon the termination of the contract the sole right to publish would return to the plaintiff, and that this sole right did not return to the plaintiff, as the defendant Silver by virtue of the purchase from Tufts continues to publish the series, and is receiving the benefit of the two thousand dollars extra capital so far as it has increased in value the right to publish jointly with the plaintiff.

But we are of opinion that this is no answer to the express contract which the parties made, namely, that the two thousand dollars should be returned by Holt to Silver at the termination of the agreement. The contract could be terminated only in the manner provided in the third article, so that it cannot be said, as has been suggested, that a termination of the contract by

notice was not contemplated by the parties. The fact that the defendant Silver continues to publish the series by reason of an independent title derived from Tufts cannot affect the obligation imposed upon the plaintiff under the Holt-Silver contract.

The result is that the decree must be

*Affirmed.*