AMERICAN CIRCULAR LOOM COMPANY *vs.* JAMES S. WILSON & another.

Suffolk.    January 15, 16, 1908. — March 4, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, SHELDON, & RUGG, JJ.

*Equity Pleading and Practice,* Master's report, Findings on master's report, Motion to recommit master's report, Injunction, Injunction bond, Damages from injunction. *Trust,* Constructive. *Equity Jurisdiction,* To enforce constructive trust. *Patent. Corporation. Election. Agency,* Agent's duty of fidelity. *Evidence,* Relevancy and materiality. *Damages. Malicious Abuse of Process.*

It is the right and duty of the judge presiding at a hearing on exceptions to a report filed by a master to whom a suit in equity had been referred, the question of final decree being considered at the same hearing, to make, without hearing further evidence, but by way of inferences from the facts reported by the master, such additional or different findings of fact as are necessary to a proper disposition of the suit.

After a hearing upon exceptions to the report filed by a master to whom a suit in equity had been referred, and upon the question of final decree, the presiding judge filed as one paper a "memorandum and order" as to the exceptions and an "order for final decree," containing, besides rulings sustaining some exceptions and overruling others and refusing to recommit the report to the master, some additions and corrections to the conclusions of the master, the materials for which were found in the report itself. An interlocutory decree subsequently was filed containing the rulings as to the exceptions, and, later, a final decree disposing of the case in accordance with the memorandum, both decrees stating that they were made "upon a master's report and exceptions thereto and the master's supplementary report," but neither the order nor either of the decrees in terms confirmed the master's report. *Held,* that such action nevertheless in effect confirmed the report.

One, who was employed as a superintendent of a manufacturing corporation, whose duty it was to use his skill and inventive ability to further the interests of his employer by devising improvements generally in the appliances and machinery used in the employer's business, invented and secured letters patent in his own name upon a machine which was designed to turn

out the same product that the employer was manufacturing and was a material improvement upon the previous mode of obtaining that product. The expenses of procuring the letters patent were paid by the employer, and many machines embodying the invention were constructed under the direction and supervision of the superintendent at the employer's expense and were used in its business with the inventor's knowledge and consent. There was no express agreement that inventions made by the superintendent while he was employed by the corporation should be the property of the corporation, nor was there any assignment of the patent to the corporation. *Held,* that the invention and the patent thereon belonged to the inventor, and that the facts did not show any breach of confidence on his part or any violation of the duty which he owed his employer such as to enable the latter to hold him as a constructive trustee of the letters patent for its benefit.

A manufacturing corporation which has employed a skilled workman for a stated compensation to devote his time and services to devising and making improvements in articles manufactured by it or in the machinery for their production, is not entitled, in the absence of an express agreement to that effect, to a conveyance of patents obtained by him for inventions made while he is so employed.

Exceptions to the report of a master which are founded on rulings by him as to the admission and exclusion of evidence will not be sustained unless a material error is shown which has been prejudicial to the excepting party.

A manufacturing corporation paid the entire expense of procuring, upon a machine which was designed to turn out the same product as the corporation was manufacturing and was a material and valuable improvement upon the method previously used by it, letters patent in the name of the inventor who was employed by it as superintendent and one of whose duties was to use his skill and inventive ability to further the corporation's interests by devising improvements generally in the appliances and machinery used in its business. Machines covered by the patent were manufactured by the corporation under the inventor's direction and were used by it in its business with his acquiescence. *Held,* that the corporation did not become entitled to any perpetual and exclusive license to the use of machines manufactured under the patent; *whether* it was entitled to a " shop right " in machines which it had, and, if it was so entitled, what the extent of such right was, were questions which were not determined because the record did not disclose necessary facts.

One, who is a director of a manufacturing corporation and the superintendent of its plant, owes to the corporation the duty to be vigilant in acquiring information as to all experiments made in its factory relating to machinery, and to communicate to the other directors all material information he may obtain in regard to contemplated improvements, in order that the corporation may act intelligently and promptly upon the subject of acquiring title to any new invention or patent relating to its machinery; and if, in breach of such duty, he himself acquires, by purchase from and assignment by the inventor, patent rights pertaining to an invention of value to the corporation, he becomes a constructive trustee of such rights for the benefit of the corporation, and the corporation can compel him to assign such patent rights to it upon its paying to him the amount which he paid to the inventor for them.

One, who was a director of a manufacturing corporation and also the superintendent in charge of its plant, learned that a certain inventor was inventing a machine which would be valuable to the corporation, and began negotiations with him in order to get an assignment to himself for his personal benefit of the

inventor's rights in the invention. The managing director of the corporation also learned what the inventor was doing and had like negotiations with him. Both the superintendent and the managing director advanced large sums to the inventor, and finally the director, with the knowledge and consent of others of the board of directors, in consideration of the superintendent's repaying to the corporation the amount which the director had advanced to the inventor, permitted the superintendent to receive in his own name an assignment of the patents procured on the invention and on some ancillary and subsidiary inventions, and made no objection to his ownership of the patents until two and a half years after the superintendent's connection with the corporation had been severed, when the corporation brought a bill in equity to compel him to transfer the patents to it. *Held*, that the corporation had lost any rights which it may have had to the patents, not only by reason of its laches, but also because of its election fairly made to waive its rights; and, *also*, that the corporation's consent that the superintendent might purchase and retain the patent rights to the principal invention extended so as to cover those upon inventions which were incidental and subsidiary to it.

A corporation which was organized for the manufacture of a certain article became financially embarrassed and its affairs were taken in hand, its debts paid, its assets taken possession of and its manufacturing business continued by another corporation, but the first corporation retained its corporate existence. Both corporations were controlled by the same stockholders. Subsequently one, who was president of the first corporation and a director of the second and superintendent in charge of the latter's plant, procured from the inventor by purchase an assignment of the patent rights to a machine which was of value in manufacturing the article which had been produced by the first corporation. The expenses of the inventor in perfecting the invention and procuring a patent thereon had been paid by the second corporation but charged on its books to the first. The second corporation brought a bill in equity to compel the superintendent to transfer the patent rights to it. The first corporation filed a petition to be admitted as a party plaintiff, which was denied upon the defendant's stating that he did not put or rest his defense on the ground that the first corporation had any right to the patent. After the suit was brought, a proper enabling vote of the stockholders of the first corporation having been passed, that corporation by assignment in writing transferred all its assets to the plaintiff. At a hearing in the suit before a master, evidence of an oral assignment of rights in patents, which was made before the suit was brought by the first corporation to the second, and of the vote and formal assignment made after the bringing of the suit, was excluded. *Held*, that the defendant, by his statement at the hearing on the petition of the first corporation to be admitted as a party plaintiff, was precluded from objecting that the first corporation, and not the plaintiff, had the right, if any, to the patent; *also*, that the evidence excluded by the master should have been admitted; and, *also*, that the plaintiff could enforce a right to the patent because it appeared that it had an interest in and was obtaining a profit from the sale of the intended product from the invention and that it would have purchased the invention if the defendant had performed his duty of fidelity which he owed to the plaintiff as its director and servant.

It is for the court, in the exercise of its discretion, to determine whether it will recommit a master's report.

It is wholly within the discretion of the court, in which a suit in equity is pending, to determine whether an injunction *pendente lite* shall issue as prayed

for therein, whether, if it issues, it shall be continued or dissolved, what terms, if any, it shall impose upon either party with regard thereto, and whether it will require the plaintiff to give any bond as a condition upon which the injunction shall issue.

Where the defendant in a suit in equity has suffered damage because of an injunction *pendente lite* issued against him therein, which the outcome of the suit determines to have been issued wrongly, but the plaintiff was not required to give a bond to indemnify the defendant against such damage as a condition for the issuance or the continuance of the injunction, the defendant is not entitled to an assessment of the damages so sustained. *It seems* that, where no such bond is required or given, the defendant would have no remedy to recover his damages in any case, unless the facts would warrant an action for malicious prosecution or malicious abuse of legal process.

BILL IN EQUITY, filed in the Superior Court for the county of Suffolk August 29, 1904, and afterwards amended, seeking to establish an alleged equitable title of the plaintiff to seven United States patents and one pending application for a patent.

On the filing of the bill, an *ad interim* injunction was ordered and, after a hearing on an order of notice to show cause why the injunction should not be continued *pendente lite*, an interlocutory decree was entered so continuing the injunction and ordering a speedy hearing before a master. Hearings were held accordingly and a draft report submitted to counsel, whereupon the plaintiff moved before the master to reopen the case for the submission of further evidence, and the master granted the motion and reopened the case, further evidence was taken, further arguments made and the case again taken under advisement. The master's first report was filed December 31, 1906. A motion of the plaintiff on January 16, 1907, to recommit the case to the master for a supplemental report on certain specified matters, was denied as to certain of the matters specified, and granted as to others, if the master "could make such report upon evidence already introduced at the hearings before him." The plaintiff appealed from so much of the order as denied its motion in part.

The supplementary report was filed February 6, 1907, and there was a hearing upon exceptions of both parties * to the report before *Schofield*, J., who, on March 15, 1907, made a

---

* There were eighty-seven such exceptions taken by the plaintiff and four by the defendant. The substance of such as were not waived at the argument before this court is sufficiently indicated in the opinion.

"memorandum and order" on the exceptions and an "order for final decree," which is referred to in the opinion and portions of which are hereinafter quoted. This memorandum directed a decree for the defendants as to what are hereinafter called the tubing machine patent and the three loom patents, and for the plaintiff as to the remaining three patents and the application for a patent.

From the order contained in the memorandum, the plaintiff appealed on March 18, and thereupon, on April 3, the defendants filed a motion that the injunction be dissolved as to the patents regarding which a decree had been ordered in its favor, a motion that the plaintiff be required to give a bond "to compensate the defendants . . . for the damages sustained by" them "by reason of any injunctions or restraining orders or stipulations" theretofore issued or made in the case, and also a motion that the damages which they had sustained by reason of the injunction with regard to the tubing machine patent, and the three loom patents be assessed. On April 4, all three of the motions were denied, the last two "with leave to the defendants to renew the application later if" they were "so advised." The defendant James S. Wilson appealed from the order denying his motion to dissolve the injunction as to the tubing machine patent and the three loom patents.

On May 4, 1907, an interlocutory decree was entered overruling some and sustaining others of the plaintiff's exceptions to the master's report. The decree as to the defendants' exceptions was as follows: "The defendants' exceptions are all overruled. They are four in number, and relate almost wholly to rulings of the master upon matters of law. The court will state its own rulings upon matters of law so far as necessary to dispose of the case in the order for final decree." From this decree the defendants appealed but the plaintiff did not.

On May 25, 1907, the defendants filed a motion that the report be recommitted to the master for findings upon certain specified matters as to which, according to an affidavit of their counsel annexed to the motion, the inferences contained in the judge's memorandum for a decree and drawn from facts reported by the master were at variance with the evidence as introduced before the master. Counsel for the plaintiff sub-

mitted an affidavit stating that the findings for which the defendants desired a recommittal of the report "are either wholly immaterial or are already sufficiently covered by matters now appearing in said master's report, or are directly contrary to the findings made by the master and the evidence upon which the master made said findings; that many of said matters set forth concerning which further findings are requested involve purely questions of law and inferences of fact and matters which can clearly be inferred from facts already appearing in said master's report." The motion was denied on September 3, 1907, and the defendants appealed.

On September 3, 1907, upon a renewal by the defendants of their motions that the plaintiff be required to give a bond to pay damages sustained by the defendants by reason of the injunction, restraining order and stipulation, and that the damages which they had suffered from the injunction as to the tubing machine patent and the loom patents be assessed, the motions were denied, the interlocutory decrees therein stating that the first was denied as a matter of discretion, and the second as a matter of law; and the defendants appealed.

With regard to the terms of Wilson's employment by the plaintiff, the master's findings in substance were as follows, James S. Wilson being called the defendant:

"In 1892 the plaintiff was engaged in a small way in producing flexible tubing at a small shop or factory at West Hanover, Massachusetts. Both its output and financial resources were very small. The defendant at this time was the owner of a factory building in Chelsea, Massachusetts, and a resident of that city. He was then about thirty-one years of age and temporarily out of employment. He had had a varied business experience, having been a travelling salesman, a shipping clerk, and assistant superintendent of a paper mill and factory, and had for some time run a stock farm. He was a man of energy and executive ability and of good character, and the matter of renting his factory in Chelsea to the plaintiff and entering its employ came up. At a directors' meeting held in 1892, the following vote was passed: 'Voted, that the treasurer be authorized to make a contract with J. S. Wilson of Chelsea, Mass., for the rent of his factory at Chelsea, Mass., at a rent of $1000 per

year, with the privilege of four years at the same rate, also for his services for one year at $1800 to be paid at the rate of $100 per month and $600 at the end of the year.' No written contract was executed, but a verbal agreement in the matter was entered into, following sundry conversations between the defendant and the officers of the plaintiff company. The verbal agreement as regards the employment was in substance for the services of the defendant at the salary above named, and defendant entered plaintiff's employ in June, 1892, in accordance with said agreement, and rented his factory to the plaintiff in accordance with the terms of said vote.

"The first important contested question which arises is as to the terms of this verbal contract of employment. What did the parties understand by the 'services' of Wilson? The plaintiff contends that defendant was hired in part at least as an inventor or mechanical expert to improve the slow and inefficient methods then in use in making flexible tubing, and in general to have full charge and control of the mechanical and producing end of the business, subject, however, to one Brooks, who was then and until his death in July, 1899, the general manager of the company; that the defendant, either by express agreement or necessary implication, bound himself to transfer to the plaintiff patents to all inventions which he might either make or acquire while in the employ of the plaintiff, or at any rate to transfer to the plaintiff all rights under such patents except in so far as he, the defendant, might be able to utilize such patents in lines of business not conflicting or competing with the plaintiff's business. The defendant denies that there was any such agreement or understanding, express or implied, as regards inventions of his own or others, or patents on the same, which he might in any way acquire. The burden of proof is on the plaintiff to establish such an agreement to transfer patents or rights thereunder, and, so far as any express contract or agreement is concerned, it has failed entirely to sustain the burden. This leaves, therefore, to be considered what contract or agreement, if any, the law would imply in the matters in dispute on the facts found. . . .

"I find that the defendant was employed as a superintendent of the manufacturing department of the plaintiff's business

under and subject to the directions of Brooks, the general manager of the corporation in June, 1892, and for some seven years thereafter. His employment involved the directing of the employees in the manufacturing department, and in general the running of the manufacturing end of the business for the best interests of the plaintiff, but under and subject to Brooks down to the time of his death. Such employment would naturally require, if a superintendent was competent, and I find did require in this case, though not formally stated in the hiring, the looking after the machinery, making improvements on the same, if within his power, and generally the improvement of the plant as regards increasing the output, raising the quality and diminishing the expense. And from July, 1899, the date of Brooks' death, the defendant had full charge and control of the manufacturing and producing end of the business, subject to one Clark, who succeeded Brooks as general manager, and subject also to the board of directors. The evidence shows and I find that the board of directors and Clark gave the defendant practically a free hand in his department. He became an employee of the plaintiff company in a position important at the time and which steadily became more important. He was legally bound to serve it faithfully and to the best of his ability. On April 5, 1898, he was elected a director of the plaintiff company, and remained a director from that time down to a few weeks before the bringing of the present suit, to wit, to August 18, 1904, when he failed of re-election at an adjourned annual meeting of the stockholders. With the selling and financial end of the business, except incidentally as a member of the board of directors, the defendant had no active duties. As regards making purchases, he had no direct or specific authority, and with one or two exceptions made none of any size. So far as the evidence shows, what purchases he did make were at all times approved or ratified by the plaintiff. He was, of course, aware of the prosperity of the plaintiff company and was a sharer therein. His own salary was increased from time to time, as were also other salaries, until it reached $5000 per annum. And, as the business of the plaintiff company increased, his responsibilities also increased. From the time he was elected a director he also knew that the com-

pany was financially able and likely in all probability, if it knew of the opportunity, to purchase patents or patent rights which might be useful in improving the quality of its goods, or its processes of manufacture, or cheapening such processes, or in any way aiding to preserve its almost complete monopoly. Especially did the defendant know of this disposition on the part of the plaintiff company after August, 1901."

As regards the tubing machine invention, the master made the following findings: "The application for the patent describes the invention as that of the defendant, and the patent itself was issued to him. . . . The expenses involved in procuring the patent, to wit, the patent solicitors and patent office fees, were paid by the plaintiff. The product turned out by the machine is the same product which is covered by the Herrick patent [a patent covering the then product of the plaintiff]. The first machine constructed which embodied the invention was paid for by the plaintiff and is the plaintiff's machine. This is true of a large number of other machines embodying the same inventions, and subsequently built from time to time to meet the growth of the plaintiff's business. Each of the machines built was in use much of the time from the date of its completion and installing in the factory before referred to down to August 18, 1904, when defendant left the employ of the plaintiff company, and, I am informed by counsel, all these machines are still there and in use or ready to use."

The findings and rulings of the judge with regard to the tubing machine patent, contained in his memorandum for a decree, were in substance as follows: "This patent was issued in 1895 to the defendant, the inventor. At that time Wilson was superintendent in charge of the manufacturing department of the plaintiff's business, receiving a salary as superintendent, and having a duty of making improvements in the plaintiff's machinery. There was no express agreement between the parties in regard to the ownership of inventions which Wilson might make or of patents which he might obtain upon them. . . . In the absence of express agreement between the parties the law will not imply an agreement requiring Wilson to convey or assign to the plaintiff any interest in his own invention, or in the patent obtained upon it. Upon the facts found

by the master, there was no breach of confidence or other violation of duty by Wilson to his employer in relation to his own invention and patent, and therefore no ground upon which to raise a constructive trust in favor of the plaintiff.

"The plaintiff contends that at least an exclusive license should be implied in its favor, on the ground (among other grounds) that the plaintiff had a substantial monopoly in the business of making and selling such flexible tubing, and the defendant owed a duty to protect that monopoly. The court declines to imply a right to an exclusive license. The plaintiff, in order to protect its monopoly, might have insisted upon making an express agreement with Wilson in regard to any patents he might obtain upon inventions made by him. Not having done so, it is entitled only to such rights as can justly be implied from the relation of the parties, and the surrounding material facts. The court rules that upon the facts of this case no license can be raised by implication against Wilson, except a license to use the existing machines actually constructed under the patent while he was in the employment of the plaintiff. If it is attempted to extend the implied license beyond such existing machines, there is no definite principle by which to limit its scope and extent, and it is therefore safer and more just to leave the parties where they have left themselves.

"The master reports that an agreement was made before him upon the subject of shop rights or implied licenses in machines, by which the whole matter was left open, and not to be passed upon in this suit. There is reason to fear that there has been some misunderstanding in regard to the scope of the agreement made before the master. Counsel for the plaintiff understood the expression 'shop rights or implied licenses' to mean merely rights in existing machines, and contend that the agreement left them free to argue that the plaintiff had an equitable right to compel the defendant Wilson to execute a license permitting the plaintiff to construct and use additional machines under the patent, to any extent to which the law would imply a license. It is not clear to the court, after comparing the various passages in which the master used the expression 'shop rights or implied licenses,' that he used it in the narrow sense in which it was understood by counsel for the plaintiff. In

view of the possible misunderstanding upon this point, the court would not feel at liberty to imply a license applicable to any but existing machines constructed during the employment of Wilson, without sending the case back to the master for a further report upon the whole question of licenses. It is unnecessary to take this action, however, for the reason that the court is of the opinion, and rules as matter of law, that upon the facts found the plaintiff has no rights in the tubing machine patent except the right to use machines constructed under it while the defendant James S. Wilson was in its employment. This right rests upon estoppel *in pais*. As to the tubing machine patent, the bill is ordered to be dismissed."

The findings of the master as to the three loom patents were in substance as follows: "Very late in 1900 one Brown began work experimenting, having in mind to invent a circular loom of an improved pattern, primarily intended to weave the cylindrical cotton covering for flexible metallic tubing. Brown was an inventor and machinist. He had a shop of his own, and before this time had frequently built machines and given expert service to the plaintiff company. He had never been in the employ of the plaintiff company on wages or salary, but had done his special work as an independent contractor. There was no evidence that Brown was asked by any one to turn his inventive ability in this direction. He apparently did it of his own accord. And he finally succeeded in inventing such improved loom, and the invention is embodied in the circular loom patent and the two ancillary patents, the shuttle patent and the bobbin holder patent, covering two separate mechanical devices in the improved loom. These loom patents are of great value, not only in the plaintiff's business, but in other lines.

" About January, 1901, the defendant, and very shortly afterward Clark, the treasurer of the plaintiff corporation and a director therein, learned that Brown was making experiments and endeavoring to perfect an improved circular loom. Each separately interviewed Brown and advanced him money, the defendant making advances before the invention had been perfected, and Clark making his advances subsequently, to enable Brown to build the first machine. The defendant's advances were made because he anticipated purchasing the invention, or

an interest therein, and Clark's in the expectation of getting some control thereof, if the machine to be constructed should prove a success.  Clark testified, and I find, that his efforts toward obtaining this invention and the patents which might be procured thereon were made in behalf of the plaintiff corporation, and by himself as its representative.  Defendant did not disclose to the officers of the plaintiff company that he knew of the invention of the loom and of Brown's work in that direction nor did he disclose that he was furnishing money to Brown to assist him in the matter, and they ascertained these facts in another way.  Clark concealed his negotiations from defendant for a time and actively tried to prevent defendant from learning what he, Clark, was trying to do. . . .

"Something of a quarrel took place between Clark and the defendant, but the final outcome was that in February, 1902, after the loom patent had been issued, and after the applications for the shuttle patent and the bobbin holder patent had been filed, Clark abandoned his attempt to get from Brown these inventions for the plaintiff company, turned his contract with Brown over to the defendant, and left the defendant to deal with Brown as he might see fit.  Defendant agreed to repay and did repay Clark the moneys which Clark had on the plaintiff company's account advanced Brown, and, without further opposition on the part of the plaintiff or Clark, completed the trade with Brown, took assignments from him of the inventions and the rights thereunder, and personally paid him about $8000. . . . At the time the plaintiff company, as above stated, was through Clark desirous of purchasing these inventions, and the patents thereon. It was financially amply able to do so, and it was greatly to the financial interest of the plaintiff company to acquire them.

"It did not appear that Clark's knowledge of the whole situation and the dealings between the defendant and Brown were absolutely complete, but I see no reason to believe that Clark's information on the subject was not reasonably complete.  Except that he was not informed, and did not ascertain until some two years later, what amount Wilson claimed to be the purchase price.  I do not find that defendant actually concealed or misrepresented anything to Clark in the matter, unless certain state-

ments of the defendant to Clark* are to be considered as material mis-statements of fact.

" The defendant, at the time he was thus dealing with Brown, was superintendent, and in charge of the mechanical and producing end of the plaintiff's business, as hereinbefore fully found, and subject of course to the general manager. He was, and for nearly three years had been, a director of the plaintiff company. He was legally bound from his position to use all reasonable efforts to serve the plaintiff's interests, and, in view of his position and his office as director, I rule he was legally bound not to act in antagonism to the interests of the plaintiff corporation, and I find his purchase of these patents was directly antagonistic to its interests, and I rule was in violation of his duty to it, inasmuch as defendant made no attempt to protect the interests of the plaintiff company in this connection. The situation was very different from the situation as regards the tubing machine, both because the tubing machine was his own invention, and because at the time that patent was obtained he was not a director. I find, however, that there was no direct contract between plaintiff and defendant covering the subject of inventions which defendant might acquire. Apparently such a contingency was not thought of when defendant entered plaintiff's employ.

" Considering the question of law on all the facts heretofore found and herein recited, I rule on the facts found that defendant was not justified in himself purchasing these three loom patents against the plaintiff's interest and desire, unless in so doing he should take proper steps to secure to the plaintiff company full rights to use the inventions in its business. So far as other and non-competing use was concerned, I see no reason why he did not have the right to obtain them for himself if the interests of his company were protected.

" But the directors of the company knew through Clark sometime prior to the closing of the defendant's trade with Brown, as well as at the time thereof, February, 1902, in part what defend-

---

* These statements were to the effect that he was paying Brown "about $10,000," or "around $10,000," which the master found were not made with any intention to deceive or mislead Clark, or with an intention to give exact figures. The master also found that Clark did not demand, or contend that he had a right to, exact figures.

ant was doing, and beyond question knew generally that the defendant was paying considerable money to Brown for these inventions, or some interest in the same, and for building new looms, and also knew he was repaying Clark the moneys Clark had advanced on plaintiff's account as heretofore stated, knew that the looms which were built under the patents and were set up and used in the plaintiff's factory by the plaintiff were not paid for by the plaintiff, but were the defendant's own property. Knowing this the plaintiff company made no demand on the defendant, made no offer to reimburse him in whole or in part, and brought no action against him to assert the rights which it claims in this bill until August, 1904, a period of almost two years and eight months from the granting of the principal patent. I rule as matter of law that this long lapse of time operates as a bar to the plaintiff company now enforcing the rights which it formerly had to relief in the matter of these patents. . . . The long delay was unreasonable. To permit the plaintiff to make its election after such delay would be to allow it to wait for time to determine the value of the inventions, and then, if defendant's bargain with Brown turned out a good one, to take the advantage of it in large part away from the defendant, and, if it proved a bad bargain, to leave it on his hands."

As to two of the remaining four patents, namely, those called the Blackler patent and the Thibodeau patent, the master found that assignments of them were procured by the defendant under circumstances similar to those appertaining as to the loom machine patents, except that there were no circumstances which would show acquiescence in the defendant's acts on the part of the plaintiff, or which would import laches to the plaintiff.

The master found that the plaintiff procured from the inventor assignments of the remaining patent, called the pipe cleaning machine patent, and the application for a patent upon a pipe bending machine, while he was president of a corporation called the Boston Electroduct Company and under circumstances which imported breaches of trust on his part toward that company such as appertained toward the plaintiff with regard to the Blackler and the Thibodeau patents. The Electroduct Company, he found, was organized by the plaintiff and Clark and Brooks, all then directors of the plaintiff, and had an unsuccessful financial

career, and that, finally, a majority of its capital stock came under the control of the plaintiff, who thereupon carried on its business as co-ordinate with its own, but that the corporate existence of the Electroduct Company continued. The plaintiff, in order to establish that it was a successor to the rights of the Electroduct Company as to the pipe cleaning machine patent and the application for a patent on the pipe bending machine, introduced evidence of an oral assignment to it before this suit was begun of the assets of the Electroduct Company by the latter and offered evidence of a formal assignment in writing made after the suit was begun. The master's report states on this subject: " I am unable to find on the evidence that there had been any previous assignment, oral or otherwise, or transfer, or any attempt to transfer legal title to the assets of the Electroduct Company. Under the circumstances I doubt if there is anything really to confirm or ratify beyond the conduct of the plaintiff in taking charge of the affairs of the Electroduct Company. But, assuming that there had been an original assignment or transfer of title of the assets, or what might be treated as such, or that the confirmatory assignment might be considered as an original assignment or transfer, either one which related backward or not, I am still of opinion and rule that equitable rights of the Electroduct Company against the defendant, if any, such as this bill is based upon, are not transferable by assignment at all. And I excluded the evidence of such assignment, saving the rights of the plaintiff in the matter."

The record shows that on December 9, 1904, the Electroduct Company petitioned to be admitted as a party plaintiff. On January 16, 1905, the following order was made on the petition: " The defendant averring that he does not put or rest his defence on the ground that the Electroduct Company has any right or title in or to the patents or any of them or the application therefor, this motion is now denied." On February 24, 1905, the plaintiff was allowed to amend its bill setting forth in detail the facts as it contended them to be with regard to the Electroduct Company and its assignment of its assets to the plaintiff.

The findings and rulings of the judge with regard to the loom patents, the Blackler and the Thibodeau patents, the pipe

cleaning machine patent, and the application for a patent upon the pipe bending machine were as follows:

" As to the patents acquired by Wilson by purchase: Wilson held a position of great importance to the plaintiff's business, as superintendent of its manufacturing department. The court finds as a fact that it was a confidential position. He had, as the master finds, ' practically a free hand in his department.' By virtue of his employment he had the best means of obtaining knowledge in respect to the plaintiff's machines. By reason of the situation in which he was placed, he owed his employer the duty to be vigilant in acquiring information as to all experiments made in the plaintiff's factory relating to machinery, and to communicate to the board of directors or at least to the managing director all material information he might obtain in regard to contemplated improvements, in order to enable his employer to act intelligently and promptly upon the subject of acquiring title to any new inventions or patents relating to its machinery. The duty of Wilson may be described as the duty of fidelity, an implied condition in his contract of employment. The court rules that if the defendant Wilson withheld information from the plaintiff which it was his duty to communicate, such withholding of information was a breach of confidence and a violation of his duty of fidelity to the plaintiff ; and if by reason of such breach of confidence he prevented the plaintiff from acquiring title to the patents in question or any of them, equity will follow the title to such patents into his hands and charge it with a constructive trust in favor of the plaintiff. There is a real distinction between the case of the patent obtained by Wilson for his own invention and those patents which he acquired by assignment from others. In the former case there was no breach of confidence. In the latter case he was bound to make full disclosure to his master before acquiring for himself.

" In applying this ruling it seems to the court that upon the facts found by the master the three loom patents stand upon a different ground from the others. As to these inventions, Wilson had negotiations with Clark, the managing director of the plaintiff corporation, and Clark left the defendant to deal with Brown, the inventor, as he saw fit. Wilson was at that time a director and paid employee of the plaintiff. It was com-

petent for the board of directors to divide and apportion the duties of management of the affairs of the corporation among themselves, for convenience and efficiency in management. Wilson, as director, was not charged with any duty in respect to the purchase of inventions or patents.  As employee, that is, superintendent in charge of the mechanical department of its business, it was competent for the plaintiff by its board of directors to make such contract with him for his services as they saw fit, and to release him from obligations of his existing contract. Upon the facts found by the master the court rules that in dealing with Clark in reference to the loom inventions Wilson could properly assume that Clark was acting for and in behalf of the corporation, and that any arrangement he might make with Clark would be in effect an arrangement between the corporation and himself.  The facts then known to Clark were sufficient to put him fully on his guard against Wilson as a competitor for the loom inventions.   Two other directors, who owned a majority of the stock of the corporation, knew substantially the facts which Clark knew, and the court rules that the arrangement between Clark and Wilson in respect to the loom patents was the agreement of the corporation, and binding upon it until set aside by a bill by minority stockholders or by some other legal proceeding.   The effect of the arrangement between Clark and Wilson was to leave Wilson free, as between himself and the corporation, to purchase the loom patents for himself.   As to these three patents the bill is ordered to be dismissed.

" The remaining patents can be disposed of together.   The court finds that Wilson failed to perform his duty to the plaintiff in respect to each one of the four patents above named, that he failed to disclose information which it was his duty to disclose and that such failure was a violation of the confidence reposed in him by his employer.   The two patents relating to electroduct stand, in respect to this duty of Wilson, upon the same ground as the Blackler patent and the Thibodeau patent, notwithstanding the somewhat peculiar business relations between the plaintiff and the Boston Electroduct Company, shown in the report of the master.   Wilson's employer, the plaintiff, was obtaining profits from the sale of electroduct under contract, and had an interest in all improvements in machinery used for

making electroduct, and a right to compete with any person for the purchase of such improvements or of any patent protecting them. The master finds that the plaintiff would have purchased the Blackler patent if it had been given the opportunity to do so. The court finds as a fact, from other facts stated in the master's report, and in addition to facts stated by him, that the plaintiff would have purchased the Thibodeau patent and the pipe bending machine patent and the pipe cleaning machine patent, if the defendant Wilson had performed his duty of fidelity to his employer. The court finds as a fact that his failure to perform that duty prevented the plaintiff from acquiring title to each of those four patents, and rules that Emma M. Wilson holds the legal title to the Blackler patent, the Thibodeau patent, the pipe bending and pipe cleaning machine patents, charged with a constructive trust in favor of the plaintiff. The remedy in damages is not adequate, and, by reason of the breach of confidence, equity imposes a trust. The defendant, James S. Wilson, was a director of the plaintiff corporation from April 5, 1898, but the court deems it unnecessary to rule upon the difficult question of the duties of an unpaid director, not charged with any specific duties as such director, and raises the constructive trust wholly out of his violation of his contract of employment, under which he was paid for his services.

" The plaintiff is entitled to an assignment of each of the four patents named, but upon condition of repaying to the present holder of the title the amount expended by Wilson to obtain title, with interest."

A final decree in accordance with the judge's memorandum was entered October 14, 1907, from which all parties appealed.

Other facts are stated in the opinion.

*A. M. Lyman*, ( *C. F. Perkins* with him,) for the plaintiff.

*S. L. Whipple*, ( *A. Lincoln* with him,) for the defendants.

SHELDON, J. It is admitted that the defendant Emma M. Wilson received her assignments without giving any valuable consideration, and that her rights are no greater than those of her husband, the other defendant. The only questions accordingly to be considered are those which arise in determining the rights of the plaintiff against James S. Wilson, who will here-

after be called the defendant. Certain facts have been found
by a master to whom the case was referred by the Superior
Court, and are set out in his report and supplementary report
and in statements made by him in reference to two hundred
and fifty suggestions and requests for findings of fact and rulings
of law made to the master by the parties; and some additional
findings of fact were made by the judge who heard the arguments
of counsel upon the exceptions to the master's report and upon
the merits. These findings are stated in the elaborate order for
a final decree made by that judge, and were made as inferences
upon the facts reported by the master. The right and duty of
the judge to make such additional or different findings of fact,
without hearing further evidence, by way of inference from the
facts reported by the master, cannot be contested. *Kennedy*
v. *Welch*, 196 Mass. 592. *Young* v. *Winkley*, 191 Mass. 570.
*Crane* v. *Brooks*, 189 Mass. 228. *Bacon* v. *Abbott*, 137 Mass.
397, 399. This was done in *Moore* v. *Rawson*, 185 Mass. 264.
And see the cases collected in 16 Cyc. 458. Nor is it material
that the master's report does not appear to have been formally
confirmed, though undoubtedly that would have been the regu-
lar procedure. It was accepted and acted upon by the judge
with certain additions and corrections, the material for which
was found in the report itself. This was a practical confirma-
tion of the report, as varied by the findings and rulings made
by the judge, especially when followed by the final refusal to
recommit the report to the master. This view is confirmed by
the fact that both the interlocutory decree as to the exceptions
and the final decree afterwards entered contain a recital that it
was made " upon a master's report and exceptions of the par-
ties thereto and the master's supplementary report." *White* v.
*Hampton*, 10 Iowa, 238, 242. *Johnson* v. *Meyer*, 54 Ark. 437,
439. And the defendant very properly has not contended that
this court has not jurisdiction to pass upon the case presented
here. It is plain that the contentions made are not by their
nature for the exclusive cognizance of the federal courts.
*Binney* v. *Annan*, 107 Mass. 94. *Desper* v. *Continental Water
Meter Co.* 137 Mass. 252, 254. *Holt* v. *Silver*, 169 Mass. 435,
455. *Wade* v. *Lawder*, 165 U. S. 624. We proceed to consider
the merits of the case.

1. The plaintiff has not established its right to require an assignment of the tubing machine patent, the letters patent numbered 543,587, and dated July 30, 1895, upon a machine for making tubing. This was the invention of the defendant himself, made while he was employed by the plaintiff as the superintendent of its manufacturing department. The machine was designed to turn out the same product, a flexible covering and protection for electric wires, which the plaintiff was already producing under the Herrick patent, so called, for the use of which the plaintiff held an exclusive license; and it was a material improvement upon the previous mode of obtaining that product. One of the defendant's duties under his employment was to look after the plaintiff's machinery and to make improvements therein. The expenses of procuring the patent were paid by the plaintiff. Many machines embodying the invention and built under the patent have been constructed under the direction and supervision of the defendant at the expense of the plaintiff, and have been used by it in its business with his knowledge and consent; and the success of its business has largely depended upon its use of these machines. But these circumstances and the other facts which have been found do not show that the plaintiff is entitled to the property right in the invention itself and in the letters patent which secure that right. The invention and the patent thereon belong to the inventor, to whom the patent has been issued, unless he has made either an assignment of his right or a valid and enforceable agreement for such an assignment, even though it was his duty to use his skill and inventive ability to further the interests of his employer by devising improvements generally in the appliances and machinery used in the employer's business. This was assumed in *Burton* v. *Burton Stock Car Co.* 171 Mass. 437, and in *Hopedale Machine Co.* v. *Entwistle*, 133 Mass. 443. It is the settled doctrine of the federal courts. *Dalzell* v. *Dueber Manuf. Co.* 149 U. S. 315. *Hapgood* v. *Hewitt*, 119 U. S. 226. *Sendelbach* v. *Gillette*, 22 App. Cas. D. C. 168. *Pressed Steel Car Co.* v. *Hansen*, 137 Fed. Rep. 403. *Barber* v. *National Carbon Co.* 129 Fed. Rep. 370. *Whiting* v. *Graves*, Fed. Cas. 17,577. *Barry* v. *Crane Brothers Manuf. Co.* 22 Fed. Rep. 396, 398. It was said by Gray, J., in *Dalzell* v. *Dueber Manuf. Co.* 149 U. S. 315: "A

manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect." And Gray, Circuit Judge, in an elaborate opinion in *Pressed Steel Car Co.* v. *Hansen*, 137 Fed. Rep. 403, 415, decided in 1905, after a careful examination of the previous decisions, says : " We have been referred to no case, nor have we been able to discover one in which, apart from express contract or agreement, and upon the mere general relation of employer and employee and of the facts and circumstances attending it, the employer has been vested with the entire property right in the invention and patent monopoly of the employee, or with anything other than a shop right or irrevocable license, to use the patented invention. Such a right in the employer, the employee may be estopped to deny, by the fact of his employment and his conduct in relation to the use of his inventions by his employer, and to that extent and no further have the cases gone." The same principle has been maintained in other States. *Eustis Manuf. Co.* v. *Eustis*, 6 Dick. 565. *Fuller & Johnson Manuf. Co.* v. *Bartlett*, 68 Wis. 73. *Joliet Manuf. Co.* v. *Dice*, 105 Ill. 649. It has been enforced between partners. *Belcher* v. *Whittemore*, 134 Mass. 330. *Burr* v. *De la Vergne*, 102 N. Y. 415. *Slemmer's appeal*, 58 Penn. St. 155, 164. How far the rule will be held to be applicable where it appears that by the express terms of the hiring the employee was to exercise his inventive faculties with reference to the specific inventions in question for the sole benefit of his employer, we need not now consider, for that question does not arise in this case. See *Gill* v. *United States*, 160 U. S. 426, 435 ; *Solomons* v. *United States*, 137 U. S. 342 ; *Hapgood* v. *Hewitt*, 11 Biss. 184 ; *Annin* v. *Wren*, 44 Hun, 352 ; *Connelly Manuf. Co.* v. *Wattles*, 4 Dick. 92. Cases in which there was an express agreement that the invention should become the property of the employer stand of course upon a different footing ; but even such agreements have been construed somewhat strictly against the employer. *Hildreth* v. *Duff*, 143 Fed. Rep. 139. *Bonsack Machine Co.* v. *Hulse*, 57 Fed. Rep. 519, and 65

Fed. Rep. 864. *Wright* v. *Vocalion Organ Co.* 148 Fed. Rep. 209. *Joliet Manuf. Co.* v. *Dice*, 105 Ill. 649. There was in this case no express agreement for an assignment of the patent, or that the invention should become the property of the plaintiff; and the facts do not authorize the inference that the parties had any understanding to that effect. The defendant was not employed to give partial form to an invention or conception which was the property of his employer, as in *Gallagher* v. *Hastings*, 21 App. D. C. 88. Nor was there as to this invention, under the circumstances shown, any breach of confidence on the part of the defendant or any violation of the duty which he owed to the plaintiff such as to enable the latter to hold him as a constructive trustee for its benefit.

It follows from what has been said that the plaintiff's thirty-third, thirty-fourth, sixty-sixth, seventieth, seventy-first and eightieth exceptions to the master's report were all properly overruled. So far as they were material to the case, they could not have been sustained. Nor does it sufficiently appear that the master ought to have been required to report the evidence applicable to any of them. The plaintiff's rights seem to have been fully protected. We cannot find that the evidence referred to in the eightieth and eighty-first exceptions bore at all upon what we deem the vital issues in the case. What was said by this court in *Long* v. *Athol*, 196 Mass. 497, 508, as to exceptions to the admission of evidence by a master is peculiarly applicable here. The plaintiff's eighty-first exception also must be overruled.

But the plaintiff contends also that it is at least entitled to an exclusive and irrevocable license under this patent to use the machine protected by it until the expiration of the patent. This contention rests largely upon the language of Brown, J., in *Solomons* v. *United States*, 137 U. S. 342, 346: "When one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employees to develop and put in practicable form his invention, and explicitly assents to the use by his employer of such invention, a jury, or a court trying the facts, is warranted in finding that he has so far recognized the obligations of service flowing from his em-

ployment and the benefits resulting from the use of the property and the assistance of the co-employees, of his employer, as to have given to such employer an irrevocable license to use such invention." That some kind of license, or at least of a shop right under this and some others of the patents in controversy has in effect been given by the defendant to the plaintiff would seem to be manifest. See, besides the cases already cited, *Keyes* v. *Eureka Mining Co.* 158 U. S. 150; *Lane & Bodley Co.* v. *Locke,* 150 U. S. 193; *McClurg* v. *Kingsland,* 1 How. 202; *Boston* v. *Allen,* 91 Fed. Rep. 248, 251; *Withington-Cooley Manuf. Co.* v. *Kinney,* 68 Fed. Rep. 500; *American Tube Works* v. *Bridgewater Iron Co.* 26 Fed. Rep. 334. It does not however fully appear whether any or all of the rights that have been given by the defendant to the plaintiff were given with or without agreement for compensation therefor, or whether the circumstances would or would not warrant a finding that any compensation was to be paid by the plaintiff to the defendant. *Burton* v. *Burton Stock Car Co.* 171 Mass. 437. *Kleb* v. *Wallach,* 6 App. Div. (N. Y.) 583. *Deane* v. *Hodge,* 35 Minn. 146. We cannot say that this claim was not to some extent open to the defendant upon his answer. The master has not found the facts bearing upon this question, acting in accordance with what he understood to be the desire and agreement of both parties. There was evidently a misunderstanding between the plaintiff's counsel and the master as to the questions of implied licenses or shop rights and royalties; but we do not consider that this misunderstanding can in any way have prejudiced the rights of either party upon any other question than the existence and extent of shop rights in the plaintiff and the defendant's right to have royalties therefor. The rights of both parties will be sufficiently protected if any decree in this suit shall be made without prejudice to either party upon these questions. There is nothing here which need deter us from considering and determining the plaintiff's claim that it is entitled to a perpetual and exclusive license from the defendant.

This question is not wholly free from difficulty. But it must be observed that most of the cases already cited, in which it was held that the property right to the invention and patent did not become vested in the employer under circumstances like those

before us, would lose their real force if they were to be construed as recognizing in the inventor merely a bare legal title, with the exclusive beneficial interest in his employer; and, however nicely an assignment might be distinguished from a license, it would still remain true that a perpetual and exclusive license for the use of a patented machine or process without the payment of any royalty would leave absolutely no beneficial interest in any one but the licensee.   Indeed, such a state of facts might be fatal to the rights secured by a valid and valuable patent, since the owner of the patent might have no motive to bring any action against infringers to protect the rights which he would be very likely to grudge to his involuntary licensee, and the mere licensee would have no right to bring such actions.   *Waterman* v. *Mackenzie*, 138 U. S. 252.   If, however, such a license could be treated in law or equity as being equivalent to an assignment, as it would be in fact, we have already seen that the plaintiff is not entitled to it.   Except the case of *Eustis Manuf. Co.* v. *Eustis*, 6 Dick. 565, which, as to the point of exclusiveness and so far as it goes beyond the agreement of the parties, is not in accordance with the great weight of precedent, we are not aware of any authority for making such an implied license exclusive, even if it could be said that it extended to the general right of using the patented machines and was not limited to the particular machines which were set up in the plaintiff's shop with the consent of the defendant.   Nor ought we, by ordering such a license, to foreclose the defendant's right to a royalty, which has not been passed upon and which we have not the means of determining. We are of opinion that the plaintiff is not entitled to any perpetual and exclusive license under this patent.   As to any less extensive right, the parties must be left in the situation in which they have chosen to place themselves by their conduct; and we need not consider whether or not there is, as contended by the defendant, any distinction between the implied license or shop right given where the mere right to sell a product is protected and where the right to use a machine or method of manufacture is concerned.   See *Gill* v. *United States*, 160 U. S. 426; *Keyes* v. *Eureka Mining Co.* 158 U. S. 150; *Lane & Bodley Co.* v. *Locke*, 150 U. S. 193; *Barber* v. *National Carbon Co.* 129 Fed. Rep. 370; *Boston* v. *Allen*, 91 Fed. Rep. 248; *Withington-Cooley*

*Manuf. Co.* v. *Kinney*, 68 Fed. Rep. 500; *Wade* v. *Metcalf*, 16 Fed. Rep. 130, 131.

The bill, so far as it relates to the tubing machine patent, must be dismissed.

2. The circular loom patent so called, being letters patent No. 690,355, dated December 31, 1901, came to the defendant by assignment from one Brown, its inventor. The defendant was at this time one of the directors of the plaintiff company, as well as the superintendent of its manufacturing department. He occupied a confidential position. *Elliott* v. *Baker,* 194 Mass. 518. The duties of his employment gave him the best means of acquiring knowledge in respect to the plaintiff's machines and of any improvements that might be devised therein. Both as director and as hired servant in a position of trust and confidence, he owed to the plaintiff, in the well chosen language of the judge of the Superior Court, "the duty to be vigilant in acquiring information as to all experiments made in the plaintiff's factory relating to machinery, and to communicate to the board of directors or at least to the managing director all material information he might obtain in regard to contemplated improvements, in order to enable his employer to act intelligently and promptly upon the subject of acquiring title to any new inventions or patents relating to its machinery." He was legally bound not to act in antagonism to the interests of the plaintiff. If there was property which was necessary for the business of the plaintiff, and which he knew that the plaintiff desired to acquire and intended and was able to purchase and pay for, in order to protect and develop its business interests, it would be a violation of his duty for him secretly to purchase that property, either for the purpose of afterwards selling it to the plaintiff at an advanced price and thus taking advantage of its necessities, or of using such property otherwise to the injury of the plaintiff; and the plaintiff could by proper proceedings in equity secure to itself the benefit of his purchase. This principle has been applied and enforced in many instances and in a great variety of cases. *Trice* v. *Comstock,* 121 Fed. Rep. 620. *Church* v. *Sterling,* 16 Conn. 388. *Blake* v. *Buffalo Creek Railroad,* 56 N. Y. 485. *Seacoast Railroad* v. *Wood,* 20 Dick. 530. *Trenton Banking Co.* v. *McKelway,* 4 Halst. Ch. 84. *Galbraith* v. *Elder,* 8 Watts, 81. *Davis* v. *Hamlin,* 108 Ill. 39.

*Gower* v. *Andrew*, 59 Cal. 119. *Hardenbergh* v. *Bacon*, 33 Cal. 356. It has been recently affirmed by this court. *Old Dominion Copper Mining Co.* v. *Bigelow*, 188 Mass. 315. *Parker* v. *Nickerson*, 112 Mass. 195. It was applied to a case involving the ownership of patent rights in *Averell* v. *Barber*, 24 App. Div. (N. Y.) 53. Nor can the duty of the defendant to communicate to the plaintiff all the information that he might acquire relative to the protection and development of its interests and business, especially of that part thereof which was under his personal charge, be denied or restricted. *Farnam* v. *Brooks*, 9 Pick. 212, 233, 234. *Edmondstone* v. *Hartshorn*, 19 N. Y. 9. *Clark* v. *Bank of Wheeling*, 17 Penn. St. 322. *Norris* v. *Taylor*, 49 Ill. 17. *Duff* v. *Duff*, 71 Cal. 513, 532. We are not impressed by the defendant's argument that, because he was not bound to communicate and turn over to the plaintiff, in the absence of any agreement therefor, all his own inventions, therefore he owes no obligation to the plaintiff with reference to other inventions which might come to his knowledge. We are of opinion that the Superior Court rightly ruled that " there is a real distinction between the case of the patent obtained by Wilson for his own invention and those patents which he acquired by assignments from others. In the former case there was no breach of confidence. In the latter case he was bound to make full disclosure to his master before acquiring for himself." Where accordingly there are no other facts found to exist, we cannot doubt that equity will, on the application of the plaintiff, subject the title to such patents as are practically necessary to the prosecution of the plaintiff's business and were obtained from others by the defendant in violation of his duty to the plaintiff, to a constructive trust in the plaintiff's favor.

This right of the plaintiff, however, was not an absolute one. The assignments to the defendant were good, except against the plaintiff. The defendant's title was merely voidable. It was at the option of the plaintiff to take the benefit of his assignments or not, as it might elect. And we are of opinion that what took place between the defendant and Clark, the plaintiff's managing director, who was acting for the plaintiff in that behalf, was in legal effect an election on the part of the plaintiff to allow the defendant to take and hold the circular loom patent upon the defendant's repaying the money which Clark in behalf of

the plaintiff had advanced to Brown upon this account. The defendant made such repayment, paid also to Brown a large sum of money, amounting to $7,500, for the patent alone, and took an assignment of this patent; and nothing further was done by the plaintiff by way of objection to this conduct of the defendant for more than two and a half years. Upon the facts found by the master and the Superior Court, the plaintiff was charged with full knowledge of the facts; and it cannot now avoid the effect of the election which it then made. *Metcalf* v. *Williams*, 144 Mass. 452. *Bassett* v. *Brown*, 105 Mass. 551. The plaintiff did not merely make an erroneous choice of a remedy which did not exist, as in *Doucette* v. *Baldwin*, 194 Mass. 131, and *Snow* v. *Alley*, 156 Mass. 193, 195. It elected to take a return of its money, and allow the defendant to purchase the patent instead of making the purchase itself. This was not a case of laches merely, but also of an election fairly made to waive an existing right within the meaning of the language of the court in *Lindsay Petroleum Co.* v. *Hurd*, L. R. 5 P. C. 221, 239. And although the facts are not the same as to the patents for the bobbin holder, No. 694, 128, and the shuttle, No. 702,281, dated respectively February 25 and June 10, 1902, yet, in view of the master's finding that these were merely ancillary and subsidiary inventions to that of the circular loom, and were designed to be used only in connection with that, and of the fact that we find nothing in the specifications of the patents themselves to lead us to a different conclusion, we are of opinion that they should now go with that patent. The plaintiff's consent that the defendant might purchase and retain the principal invention should be extended so as to cover also the incidental and subsidiary inventions. This is only a special application of the underlying principle of *Orcutt* v. *McDonald*, 27 App. D. C. 228, and *Gedge* v. *Cromwell*, 19 App. D. C. 192.

It follows that the rulings of the Superior Court sustaining the plaintiff's fifth and ninth exceptions to the master's report, and overruling the third, eighth, fifty-ninth and sixtieth exceptions was correct; and that the bill cannot be maintained as to the patents just mentioned.

3. The Blackler patent, No. 751,777, dated February 9, 1904, upon a flexible tubing or conduit of new and improved design,

and the Thibodeau patent, No. 794,433, dated July 11, 1905, upon a machine for making tubing, issued since the bringing of the bill upon one of the applications named therein, need not be particularly considered. For the reasons which have been stated in reference to the circular loom patent, the plaintiff may treat the assignments of these patents obtained by the defendant as really taken in trust for its benefit, and may have them transferred to itself upon reimbursing to the defendant the respective amounts paid by him therefor. The plaintiff's eleventh exception to the master's report must be sustained, and its tenth, sixty-first and eighty-sixth exceptions must be overruled. There was no error in the rulings made by the Superior Court as to these matters.

4. The remaining patent, that numbered 686,921, and the application for a patent upon a pipe cleaning machine, differ from the other patents which were acquired by the defendant by purchase and assignment from their inventors only in the fact that the equitable right to these was originally in the Boston Electroduct Company, another corporation, which, though in a sense organized and for a time maintained in the mere interest of the plaintiff and as a subsidiary company to it, had yet an independent existence, and of which the defendant was himself the president. It was found to be the Boston Electroduct Company and not the plaintiff which originally had at its election the right to the remedy here sought to be enforced against the defendant. But under the circumstances here existing we do not regard this fact as material, for two reasons.

In the first place, the record shows that at a comparatively early period of the litigation, while hearings were going on before the master, the Electroduct Company asked leave to join in the suit as a party plaintiff. The defendant opposed this request, and declared that he did not put or rest his defence on the ground that that company had any right or title to the patents or any of them or the applications therefor. Upon this declaration, the request of the Electroduct Company was denied by the judge. In the second place, it also appeared that, the business of the Electroduct Company having been unsuccessful and its resources having been exhausted, the plaintiff, as a kind of unofficial liquidator, in the fall of 1898, took possession of

all its assets, paid or compromised its debts, and itself virtually took charge of all that company's affairs. The corporate existence of that company was continued; but there was no meeting of its stockholders or directors after the plaintiff took possession of its assets, until November 9, 1904. The inventions in question were made by Brown in and after 1899. The plaintiff paid him for his work, charging this however upon its books to the Electroduct Company. At an adjournment of the abovementioned stockholders' meeting, on November 15, 1904, it was voted that the company assign all its assets to the plaintiff, and that the officers of the company should execute all necessary papers for that purpose; and on February 1, 1905, a formal assignment of all the property and assets of that company, including "interests in letters patent, . . . inventions, . . . and choses in action," was made to the plaintiff. Copies of this vote and of the assignment are annexed to the master's report. We do not doubt that this claim of the Electroduct Company was assignable, or that it passed by the assignment. *Jenkins* v. *Eliot,* 192 Mass. 474. *Andrews* v. *Tuttle-Smith Co.* 191 Mass. 461, 465. *Currier* v. *Howard,* 14 Gray, 511. Moreover, independently of the defendant's verbal stipulation and of the facts which we have stated, the plaintiff had at the very time of the making of these inventions an interest in their intended product, and was obtaining a profit from the sale of that product; and it was found by the Superior Court, with manifest correctness, that the plaintiff would have purchased these inventions if the defendant had performed the duty of fidelity which he owed to it both as a director and as a servant.

Accordingly the plaintiff's exception to the ruling of the master excluding the above-mentioned vote and assignment was properly sustained; and the ruling that the plaintiff was entitled to assignments of this patent and of this application was right.

It is not necessary to consider the defendants' exceptions in detail after what already has been said. They were all rightly overruled.

It was for the judge, in the exercise of his discretion, to determine whether it would recommit the master's report as requested. at different times by each party. *Henderson* v. *Foster,* 182 Mass.

447. *Eddy* v. *Fogg*, 192 Mass. 543. We find no error in the manner in which that discretion was exercised. Accordingly we need not consider a large number of the plaintiff's exceptions, which are stated in the brief of its counsel to depend upon this motion. There appears to be no error in the rulings of the Superior Court upon the other exceptions.

It was also wholly in the discretion of the judge to determine whether it would issue, continue or dissolve an injunction, and what terms, if any, it would impose upon either party, and whether it would require the plaintiff to give any bond as a condition of issuing an injunction. And, no bond having been ordered or given, the judge correctly ruled, that the defendants were not entitled to an assessment of the damages sustained by them by reason of the injunction restraining them from disposing of the patents which by the final decree they were allowed to retain. In *Meyers* v. *Block*, 120 U. S. 206, 211, it was said by Bradley, J.: "Without a bond no damages can be recovered at all. Without a bond for the payment of damages or other obligation of like effect, a party against whom an injunction wrongfully issues can recover nothing but costs, unless he can make out a case of malicious prosecution. It is only by reason of the bond, and upon the bond, that he can recover anything." Many other cases to the same effect are collected in 22 Cyc. 1061. The defendant, as to the matters in which the plaintiff fails of final recovery, is in the same condition as one whose property was attached in a suit at law which the plaintiff finally has failed to maintain. Beyond such costs as he may be entitled to recover, his only remedy is by an action for malicious prosecution or malicious abuse of legal process. *Zinn* v. *Rice*, 154 Mass. 1. *Lindsay* v. *Learned*, 17 Mass. 189. Cases which have been decided as to the remedy where an injunction bond has been given are not applicable here. *Russell* v. *Farley*, 105 U. S. 433. *Carpenter* v. *Fisher*, 68 N. H. 486. It was not necessarily unjust that the defendants should have been restrained from disposing of any of these patents until a final determination of the rights of the parties could be reached. If there were any special circumstances to be considered, they were doubtless brought to the attention of the Superior Court.

But there are some irregularities in the final decree entered in

the Superior Court which ought to be noticed. The decree does not state what amount is to be paid by the plaintiff for the acquirement of one of the patents or of the pending application for a patent, but leaves blanks for these amounts, and provides for a future application to the court to determine them. These questions should not be left open in a final decree. And the defendant should not be required absolutely to make assignments of all the patents for which he is held. As to each of these, the plaintiff has an option whether to take it at the price found by the court or not. The order should be as to each patent that the female defendant assign it to the plaintiff upon payment by the plaintiff of the sum found as to that patent by the court. *Hill* v. *Hall,* 191 Mass. 253, 269. Nor should the decree be without prejudice to the rights of the defendants or either of them to recover royalties or license fees under any of the patents. This should be limited to the four patents which the defendants are allowed to retain. And it should also be without prejudice to the right of the plaintiff to claim that it is entitled to a shop right or license under each of these patents. With these modifications, the decree of the Superior Court should be affirmed; and it is

*So ordered.*