CHARLES H. NUTTING, JUNIOR, & another, executors, *vs.*
HERBERT A. KNEELAND & others.

Suffolk.   October 1, 1951. — March 26, 1952.

Present: QUA, C.J., WILKINS, SPALDING, & WILLIAMS, JJ.

*Accounting.   Contract,* Construction, Of employment, To share profits.
*Interest.   Profits.*

The contractual arrangement between an insurance firm and an employee
who was manager of a department of the firm was to be determined in
the circumstances from the established practices of the parties in their
dealings in the absence of any written contract between them.
Under a contract between an insurance firm and the manager of one of
its departments whereby his compensation included a specified share
of the net profits of the department, the fact that it had been cus-
tomary for the parties to account for such profits at the end of each
period of six months did not affect the manager's right to participate
in the profits earned between the end of one of such periods and the
termination of the contract upon his death during the next period.
In an accounting of the net profits of a department of an insurance firm
up to the time of the death of the manager of the department and con-
sequent termination of a contract between him and the firm whereby
he was to receive a certain share of such net profits as part of his com-
pensation, his estate was entitled to the benefit of certain commissions
and fees earned before his death but not received or credited to the de-
partment until thereafter; his estate was not entitled to the benefit
of an increase in the rates of commissions arranged for by his suc-
cessor after his death respecting business done before his death; it was
proper to charge to the expenses of the department a part, propor-
tionate to the accounting period, of certain bonuses paid to employees
of the department; and his estate was entitled to interest from the
date of the demand for an accounting on sums for which the firm was
accountable and which had been received by it before that date, and,
on sums received by the firm thereafter, from the dates of their re-
ceipts.

BILL IN EQUITY, filed in the Superior Court on March 21,
1944.

The suit was heard by *Goldberg*, J., upon reports of a
master.

*A. S. Allen,* for the defendants.

*J. C. Kane,* for the plaintiffs.

WILLIAMS, J.  This is a suit for an accounting by the executors of the estate of one Charles H. Nutting against the members of the firm of John C. Paige & Company with whom Nutting had been associated from September 1, 1901, until his death on October 19, 1942.  The case was referred to a master under the usual rule.  His findings as to the relationship of the parties were substantially as follows.

In 1901 Nutting and one Edwy T. Wells were partners carrying on a marine insurance business under the name of Nutting & Wells.  John C. Paige & Company was a partnership engaged in a general insurance business in Boston.  In September of that year Nutting and Wells entered the office of the defendants as managers of a department thereafter called the Nutting & Wells department.  Nutting and Wells handled their own as well as the defendants' marine insurance business.  The salary of each was paid by a syndicate of insurance firms of which John C. Paige & Company was a member.  By 1912 the payment of their salaries had been assumed by the defendants.  In that year each of the Nutting & Wells partners was receiving an annual salary of $6,000 and in addition one sixth of the net profits of all the business credited to the Nutting & Wells department.  The business of the department was mainly marine insurance but there were included some fire insurance, automobile insurance, and other forms of insurance except life insurance.  In 1914 the annual compensation of both Nutting and Wells was increased to $8,500 and one third of the net profits of all marine insurance business.  In that year the syndicate paid the premium on a $10,000 policy on the life of Nutting and thereafter continued to pay the annual premium until Nutting's death.  The salaries of Nutting and Wells were continued on the same basis until 1931 when Wells died.  There is no finding that the syndicate continued to be concerned with the employment of Nutting and Wells except in regard to its payments on the aforesaid life insurance policy.  In 1923 or 1924 additional insurance was placed on

the life of Nutting in the amount of $40,000, the premiums on which were paid by the defendants.

The Nutting & Wells department occupied one tenth of the office floor space used by the defendants. It was charged with rent, salaries, advertising, taxes, postage, cables, telephone, printing, supplies, repairs, travelling expenses, and certain other minor items. All moneys received by the department were deposited in a special bank account in the name of John C. Paige & Company and all expenses of the department, including salaries, were paid from that account. The defendants kept account books reflecting the business of the department in which certain items of income were entered on an accrual basis and other items of income and expenses on a cash basis. Nutting & Wells also kept their own account books. The individual salaries of Nutting and Wells were paid semimonthly and their shares of the profits accounted for and paid to them twice a year on June 30 and December 31.

On the death of Wells in 1931 Nutting continued to carry on the business of the department as before. It continued to be known as the Nutting & Wells department, Nutting having received permission from the executor of the estate of Wells to use the firm name of Nutting & Wells. After the death of Wells, Nutting received the same salary as before and the same percentage of the profits of the department, but the one third of the profits previously paid to Wells was retained by the defendants.

After 1932 the premiums on the $40,000 life policies of Nutting were charged to the department as an expense. Nutting died on October 19, 1942. He had been ill since May, 1941, and unable to come to the office. During the period of his illness the business of the department was carried on by two employees of the department, one Kendrick and one Sweeny, acting as co-managers, assisted by one Bloomfield. There were ten or twelve other persons regularly employed in the department. Nutting continued to be paid his regular salary in semimonthly instalments, his last instalment being paid four days before his death.

The last accounting of profits made with him was on June 30, 1942, in consequence of which he was paid $21,040.24 on August 21, 1942.

The master found that Nutting and the defendants were not partners and were not engaged in a joint venture but that their relationship was that of employer and employee; that they had no written contract; and that the terms of their contractual arrangement were to be gathered from their established practice and method of dealing with each other.

These findings, which in the main were contained in a preliminary report, were supplemented by the inclusion in the report of the following facts, agreed upon by the parties:

" (1) The system of accounting between the defendants and Nutting with respect to profits was this: Each accounting covered a six months' period, these periods ending on June 30 and December 31, respectively. The receipts for a given period were first computed; from this total certain expenses were then deducted; and the balance, if any, remaining represented the profits of the Nutting and Wells department for that period. The receipts were divided into three classes of items, namely, (1) commissions on policies ,written, (2) 'contingents,' so called, and (3) adjusting fees — these fees covered services for adjusting losses during the accounting period. The accounting covered only business which was completed within the accounting period. As to policies written through the Nutting & Wells department, such a policy did not become completed business until sufficient information was received to enable one to compute the premium due thereon, whereupon it was entered on the books as completed business. Each accounting included all insurance thus completed within the accounting period, regardless of whether payment of the premiums therefor was received within that period.

" (2) and (3) One class of marine insurance policies, known as 'open' policies, requires further explanation: In marine insurance there are what is known as 'open' import-cargo policies. Such a policy covers goods of the kind

therein described shipped from a foreign port and remains
in effect until cancelled — the risk under such a policy
attaches when the goods are shipped. As to such policies
it often is impossible to ascertain promptly the goods
shipped thereunder or by what vessel, with the result that
until a bill of lading or other document evidencing the
shipment is received by the insurer it is impossible to com-
pute the amount of the premium and thereby complete the
business. Until this information is received such business
cannot be completed and under the accounting practice
between the defendants and Nutting such business was not
entered on the books as completed business until this
further information was received. When Nutting died on
October 19, 1942, there were outstanding certain of these
'open' policies on which shipments had been made prior
to October 19, but the information necessary to compute
the amount of the premium, and thereby complete the
business, was not received until after October 19.

"(4) As to 'contingents,' so called: Each of the agency
contracts in existence at the time of Mr. Nutting's death
in which Nutting & Wells were designated as agents con-
tained a provision with respect to the payment by the in-
surance company of a 'contingent' commission, so called,
or as it is called in the insurance business, a 'contingent.'
. . . [The contracts] provide in substance that the net
receipts of the insurance company for a given year shall be
computed, from which shall be deducted certain expenses,
including certain losses; and if these figures, which are
computed by the insurance company, show that the oper-
ations for that year have been sufficiently profitable, a
contingent commission, payable to the agent, is declared.
Whether or not such a contingent commission will be paid,
and the amount of it, cannot be determined until at least
a year after the business was written, and in some instances
even longer. Under the accounting practice between the
defendants and Mr. Nutting such a 'contingent' did not
become completed business until payment therefor was
actually received by the defendants, whereupon it was

entered on the books as completed business. After June 30 and after October 19, 1942, respectively, the defendants received certain contingent commissions under some of the agency contracts above referred to, on business written prior to 1942."

On consideration of the master's preliminary report the judge entered the following interlocutory decree: "1. That the master's report be, and it hereby is, confirmed. 2. That the facts stated in the 'Agreement with Respect to Further Findings by the Court' are true. 3. That the plaintiffs are entitled to one third of the net profits of the business done by the Nutting and Wells department of the defendants up to and including the date of the death of the plaintiffs' testator on October 19, 1942, on the basis herein below stated. 4. That in determining such net profits the following only shall be included as income: (a) Receipts of all 'completed business' done by the said Nutting and Wells department up to and including October 19, 1942; (b) Contingent commissions or 'contingents,' so called, based on business written through the said Nutting and Wells department up to and including October 19, 1942, which were received after said date; (c) Fees for adjusting losses received after October 19, 1942, where the work was performed by the said Nutting and Wells department on or before said date; (d) Commissions from 'open' policies, so called, written through the said Nutting and Wells department where the risk attached on or before October 19, 1942, but where the information necessary to make it 'completed business' was received, or the bookkeeping entries were made, after said date. 5. That in determining the amount of said net profits, allowance shall be made for all amounts which are properly chargeable in accordance with applicable legal principles against the income described in paragraph 4 hereof. 6. That the cause be and hereby is recommitted to the master to determine the several amounts found by him under each separate subparagraph of paragraph 4 and under paragraph 5 hereof, upon such evidence material to such determination as the parties may present, and to

report to the court the respective amounts so determined."
From this decree the defendants appealed.

The appeal raises the issue of the plaintiffs' right to participate in a share of the profits based upon commissions or fees received after the death of Nutting. It is the contention of the defendants that their only obligation was to account at the end of each stipulated six months' period for all business reflected on the books as completed business; that they have accounted for all business completed on the books at the end of the last accounting period prior to Nutting's death; and that at the time of his death, they owed Nutting nothing except salary from October 15 to October 19. In the absence of a written contract between the parties, the master correctly ruled that their contractual arrangement must be determined from the established practice of the parties in dealing with each other from the time of the original association to the date of Nutting's death. See *Winchester* v. *Glazier*, 152 Mass. 316, 323; *Holyoke Water Power Co.* v. *Whiting & Co. Inc.* 276 Mass. 528, 541; *Arey* v. *George Associates, Inc.* 299 Mass. 130, 133. Nutting's compensation was derived from his stipulated salary, and from a one third share of the profits of the department which was managed by him. It is not disputed that he was entitled to his salary up to the time of his death, and it is difficult to see why he is not equally entitled to his share of the profits based upon income of the department which had been earned up to the same time. The defendants urge that his right to profits is controlled by the fact that it was customary to account for such profits only at the end of the aforesaid six months' periods. In our opinion, however, this practice of accounting was developed as a matter of convenience and did not qualify the essential right of Nutting to participate in the profits earned between the accounting dates. It is plain that, for purposes of disbursement or apportionment of the profits, such profits must be ascertained at certain intervals. During Nutting's life no question arose as to his right to all profits which had been earned. Moneys received after any one accounting period would be paid at

the end of some future period. At his death his employment contract was terminated. *Mills* v. *Smith,* 193 Mass. 11, 17. *Browne* v. *Fairhall,* 213 Mass. 290. *Donlan* v. *Boston,* 223 Mass. 285. *Cutler* v. *United Shoe Machinery Corp.* 274 Mass. 341, 345. *Shawsheen Dairy, Inc.* v. *Keefe,* 307 Mass. 30, and cases cited. Thereupon his personal representatives became entitled to a percentage of all profits which had been earned prior to his death. A case in point is *Federal Ins. Co.* v. *Gilmour,* 206 Mass. 203, 205, where there was no express provision for the termination of an agency contract and where the commissions payable were "predicated on the yearly profits of the Agency." It was there said, "The words, 'predicated on the yearly profits' do not indicate an intention that no such profits should be ascertained in the event of a termination of the agency between the annual dates fixed in the contract, but rather describe a term of calculation which is to be used year by year, so long as the contract is in force, and for any fraction of a year remaining unadjusted when the relation of principal and agent ceases." See also *Kavanagh* v. *Ellingson,* 321 Mass. 122; *Roberts* v. *Eastland Food Products Co. Inc.* 323 Mass. 466. Compare *Allcott* v. *Boston Steam Flour Mill Co.* 9 Cush. 376; *Thompson* v. *Saco Water Power Co.* 114 Mass. 159; *Sobel* v. *Signal Shoe Co.* 286 Mass. 286. We think that there was no error in the interlocutory decree which required an accounting of the receipts of all completed business prior to October 19, 1942, and also of all commissions and fees which had been earned prior to October 19, 1942, but which were not received until later. The only difference between completed business where the commissions and fees had not been received and commissions and fees which had been earned but not entered on the books as completed business was that the former business had been entered on the books and the latter had not. The intent and effect of the decree was to give the plaintiffs the benefit of all profits earned by the department before the termination of the contract irrespective of the time when they were actually received or credited.

The master proceeded to an accounting in accordance with the provisions of the interlocutory decree and filed a supplemental report on February 6, 1950.

The judge in a second interlocutory decree found, on the basis of subsidiary findings in the report, "that a reasonable allowance as expense against the total contingent commissions received by the defendants should be . . . 20% of that total instead of" $250 as allowed by the master (see *American Circular Loom Co.* v. *Wilson*, 198 Mass. 182, 200); that the plaintiffs are entitled to one third of the net profits from hull insurance amounting to $166.59 where the risk attached on or before October 19, 1942; and that the plaintiffs are entitled to interest as of April 12, 1943, the date of formal demand by the plaintiffs, on all income received prior to that date, and on all income received thereafter interest as of the date of such receipt. He overruled certain objections to the report filed by the defendants, sustained others, and confirmed the report as modified by his findings and rulings.

A final decree was entered ordering the defendants to pay to the plaintiffs the sum of $54,521.55 (computed in accordance with a statement annexed to the decree marked "A") with costs; and that when the defendants receive from the Boston Insurance Company any portion of $3,526.87 found due from it as contingent commissions for 1938 and 1940 they shall pay to the plaintiffs one third of any amount received less a deduction of 20% thereof for expenses "with interest on the said net sums received from the date of the entry of this decree." The defendants appealed from the second interlocutory decree and from the final decree.

The substance of the objections which were overruled may be dealt with as we consider the matters pertaining to the accounting which have been argued by the defendants. At the time of Nutting's death there were in effect agency contracts of Phoenix Assurance Company, Limited, Insurance Company of North America, Western Assurance Company, American Insurance Company, Fire Association

of Philadelphia, Boston Insurance Company and Security
Insurance Company, in each of which Nutting & Wells
were named as agents to write marine insurance.  There
was also an outstanding agency contract dated July 1,
1931, between Commonwealth Insurance Company of
New York and Nutting & Wells "a co-partnership" and
an agency contract dated April 5, 1934, between Travelers
Fire Insurance Company and C. H. Nutting "doing busi-
ness as Nutting & Wells."  The master found that when
Nutting & Wells first entered the office of John C. Paige &
Company, they "in addition to . . . [their] own . . .
handled . . . [the defendants'] marine business."  He also
found that "other than the agencies of the insurance com-
panies standing in the name of Nutting & Wells there
were no other 'capital' assets" of Nutting in the depart-
ment at the time of his death.  In our opinion these con-
tracts were the personal property of Nutting.  On October
19, 1942, after learning of Nutting's death Kneeland, one
of the defendants, telephoned to the various insurance com-
panies notifying them of Nutting's death and arranged for
agencies in the name of John C. Paige & Company.  The
contracts were terminated by the various companies on
that date.

The contract with Agricultural Insurance Company pro-
vided for a "development allowance" to be paid to the
agent on certain classes of business which had been written
in a preceding year.  The amount of this allowance on
1941 business was computed in August, 1942.  Instead of
paying this allowance directly, the company arranged for
payment through deductions to be made from the amounts
remitted monthly to it by the defendants through the year
1942.  The master has allowed the sum of $1,414.04 to be
credited to income as an amount deducted by the defend-
ants from their remittances to this company in 1942, which
deduction did not appear upon their books as completed
business on October 19, 1942.  This sum is in the nature of
a contingent commission earned by the department prior
to Nutting's death and was properly allowed as a credit.

If it is not strictly within the terms of the first interlocutory decree, the master's finding in respect to it has been adopted and approved in the second interlocutory decree and the final decree.

There was an oral agreement with the American Insurance Company which terminated in July, 1942, under the terms of which an additional commission on cargo insurance amounting to $132.42 was allowed by the company on July business. This commission was indirectly received by the defendants on October 26, 1942, through a deduction of the amount in question from the amount of premiums remitted by the defendants to the company on that date. This amount was properly credited to income for the reasons stated in connection with the Agricultural Insurance Company's allowance.

The contract with the American Insurance Company provided for contingent commissions of 10% of the net yearly profits of the company on all inland marine business and 15% on ocean marine business written by the agency, to be calculated and paid after twelve months from the end of each year for which they were to be computed. The items of this business appear respectively in so called number 1 and number 2 accounts. It was provided that, if "at any time this contract be terminated, the last contingent commission shall not be paid until at least twelve months after the date the contract ceases, and not until all outstanding losses have been adjusted and paid." Although, as we have stated, the contract terminated on October 19, 1942, the contingent commissions which were prepared by the company for the year 1942 were not computed on the basis that the contract had terminated, but were computed as if no change in the agency had taken place. The master found that in 1943 the sum of $5,798.17 was received on account of contingent commissions due on 1941 business and has allowed this amount as a credit to income. After the end of 1942, Kendrick arranged with the company for the payment of contingent commissions of 32% on all of the 1941 business instead of 10% on number 1 business and 15% on

number 2 business. In 1944 he arranged for an additional commission of 17% on number 2 business. The sum which the master has credited to income on the 1941 business is calculated on the 32% basis. We think that in such calculation the master was in error. At the time of his death Nutting was entitled to the benefit of the contract as it then existed and his representatives are not entitled to the benefit of the subsequent changes in commissions arranged by Kendrick. The proper credit on the 1941 business is $2,599.54.

The master found that for 1942, as of October 19, 1942, the profit to the insurance company on number 1 business was $6,325.21 and the profit as of that date on number 2 business was $32,733.76. The commissions to which Nutting was entitled on this 1942 business based on the commission rates in effect at his death totaled $5,542.58. In the years 1944, 1945 and 1946 commissions on the 1942 business, received by the defendants and credited to income, were in excess of the commissions to which Nutting was entitled at the time of his death. Such commissions were allowed as credits by the master in the sum of $9,819.98. These commissions were based on the increased rate which had been arranged for by Kendrick, and we think the master was in error in allowing a credit for this amount. The proper credit was $5,542.58, the amount above stated.

After October 19, 1942, the defendants received $624.73 as commissions on hull insurance which was credited by the master to income. A finding of this item was not authorized by the first interlocutory decree, but it has been allowed by the judge in the second interlocutory decree and in the final decree, and we think there was no error in such allowance. These commissions were earned before October 19, 1942.

The master found that there is due to the department the sum of $3,526.87 from the Boston Insurance Company on business which was written in 1938 and 1940. This amount has not been received, and in the final decree it is provided that one third of so much of this amount as in the future shall be received is payable to the plaintiffs. In this, we think, there was no error.

The master has allowed the sum of $250 as an expense incidental to the collection of the contingent commissions. In the second interlocutory decree the judge found a reasonable allowance for such expense was 20% of the amounts received. In such finding we think the judge was not wrong. It was based apparently on subsidiary findings of the master as to the general relation of expense to income which appeared in the accounts of the department.

At the end of 1942 the defendants paid to Kendrick, Sweeny, and Bloomfield, who were employed in the Nutting & Wells department, bonuses in the amount of $11,250 for the period from July 1, 1942, to December 31, 1942, and charged the same to the department as expense. The pro rata portion of this amount computed for the period from July 1, 1942, to October 19, 1942, was disallowed by the master as an expense or charge against income. Bonuses of $1,250 had been paid to these three men at the end of 1940, and $2,250 at the end of 1941, the last so called bonus year prior to October 3, 1942. At the end of the first six months of 1942, bonuses of $11,250 were paid to them and were approved by Nutting. The master found that the agreement under which Nutting and the defendants conducted the business of the department did not vest in the defendants the sole discretion as to what should be charged to the department as expense, but that expense charges were matters upon which it was understood there was to be mutual agreement. At the time Nutting expressed his approval of the payment of the 1942 bonuses, he stated that he thought that the bonuses should have been larger. At that time the business of the department was very profitable. Apparently, it continued to be profitable throughout the year 1942. Nutting must have contemplated the payment of additional bonuses to these three employees at the end of the year at which time it had been customary during the last two years to make bonus payments.

We think it was understood by the parties that if business continued to be good additional bonuses would be paid at the end of the year. The defendants were justified in be-

lieving that bonuses amounting to at least one half of the amount of bonuses paid at the end of the last bonus year were impliedly authorized. They were therefore justified in charging to expense such an amount, that is, the sum of $1,125. The prorated charge for the period from July 1, 1942, to October 19, 1942, would be $678.65, and the defendants were entitled to have this amount allowed as a charge to expense. The payment of a bonus in such amount being on the basis of those paid in the last bonus year would not be illegal under the wage stabilization law which became effective on October 3, 1942. Regulation 1002.14 of the commissioner of internal revenue provided that, "A bonus or other form of additional compensation which does not exceed in amount the bonus or other additional compensation to such employee for the last bonus year ending before October 3, 1942 does not require approval by the Commissioner." 7 Fed. Reg. 10,050, 10,054.

In the second interlocutory decree it is provided that the plaintiffs are entitled to interest as of April 12, 1943, the date of formal demand for an accounting by the attorney for the plaintiffs, on all income received by the defendants prior to that date, and that on income received by the defendants after April 12, 1943, interest be allowed as of the date of its receipt by the defendants as found by the master. We think that in this there was no error. See G. L. (Ter. Ed.) c. 235, § 8; *Cochrane* v. *Forbes,* 267 Mass. 417, 420–422; *Buckley & Scott Utilities, Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 509–510.

The first interlocutory decree is affirmed. The second interlocutory decree should be modified by providing that objections 6, 13, 17, and 19, which concern the changes which we have indicated should be made in the master's accounting,[1] be sustained and as so modified is affirmed.

---

[1] "Recapitulation Total due plaintiffs, including interest, to February 6, 1950," appearing in statement "A" annexed to final decree, as modified to conform with this opinion.

(a) Plaintiffs' share of net profits on "completed

| | | | | | | |
|---|---|---|---|---|---|---|
| business" | . | . | . | . | . | $28,212.31 |
| Interest to February 6, 1950 | | . | . | . | 11,547.71 | |
| Total . | . | . | . | . | . | $39,760.02 |

The final decree must be modified so that the sum ordered to be paid shall conform to the changes in credits and charges effected by this opinion. The decree should also be modified by providing that interest on sums received in the future from Boston Insurance Company be computed from the dates of receipt rather than from the date of this decree. As so modified the decree is affirmed with costs.

*So ordered.*

| | | |
|---|---|---|
| (b) Plaintiffs' share of net profits from contingents . | $2,720.77 | |
| Interest to February 6, 1950   .   .   . | 979.44 | |
| Total .   .   .   .   .   .   . | | $3,700.21 |
| (c) Plaintiffs' share of net profits on fees for adjusting losses   .   .   .   .   .   . | $261.74 | |
| Interest to February 6, 1950   .   .   . | 89.79 | |
| Total .   .   .   .   .   .   . | | 351.53 |
| (d) Plaintiffs' share of net profits from "open" policies, so called .   .   .   .   .   . | $3,494.23 | |
| Interest to February 6, 1950   .   .   . | 1,348.41 | |
| Total .   .   .   .   .   .   . | | 4,842.64 |
| Plaintiffs' share of net profits from hull insurance | $166.59 | |
| Interest to February 6, 1950   .   .   . | 68.14 | |
| Total .   .   .   .   .   .   . | | 234.73 |
| Total .   .   .   .   .   .   .   .   . | | $48,889.13 |